457 S.E.2d 644

**STATE of West Virginia DEPARTMENT OF HEALTH AND HUMAN RESOURCES, CHILD ADVOCATE OFFICE ex rel. Travis Wade CLINE, Minor Child of Kim Yvonne Cline, Plaintiff Below, Petitioner,**

v.

**Timothy P. PENTASUGLIA, Defendant Below, Respondent.**

**No. 22028.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 1, 1994.

Decided April 14, 1995.

Richard Goldstein, Princeton, for Child Advocate Office.

John P. Anderson, Princeton, for Timothy P. Pentasuglia.

Henry L. Harvey, Guardian Ad Litem for Travis Wade Cline, Princeton.

## WORKMAN, Justice:

This case is before the Court pursuant to the certified question entered on August 23, 1993, by the Circuit Court of Mercer County.[1] In an order entered on that same day, the circuit court dismissed a paternity proceeding initiated by the State of Virginia pursuant to the Revised Uniform Reciprocal Enforcement of Support Act ("RURESA"), West Virginia Code §§ 48A–7–1 to –41 (1995).[2] The dismissal was based upon the grounds that the child and the State were barred from seeking to establish paternity against the Respondent. This decision was based on the fact that a prior decree of divorce in Virginia between the mother and her former husband, Ronnie Cecil Cline, had established Mr. Cline as the child's natural father.

In February, 1989, the mother, Kim Cline, filed a bill of complaint for divorce in Giles County, Virginia. The bill stated that the mother had been lawfully married to Mr. Cline on December 7, 1981, and that there were two children born of this marriage, namely Travis Wade Cline, born May 15, 1980, and a second child. A birth certificate was filed in Virginia in May, 1980, which listed Mr. Cline as the child's father. On May 10, 1989, the Circuit Court of Giles County issued the divorce decree between Mr. Cline and the mother and simply repeated the mother's reference to Travis' paternity. The court granted custody of the children to the mother and ordered Mr. Cline to pay fifty dollars weekly for child support as well as certain arrearages.

The mother alleges that the Respondent visited Travis in January 1991. Shortly thereafter, the mother filed a motion in Giles County, Virginia, asking that Travis be removed from the support order and asking that the payment for the remaining child be left at fifty dollars per week, with ten dollars on back support. The motion was granted in February 1991, removing Travis from the support obligation.[3]

Later, an attempt was made to establish the Respondent as the child's father. In 1992, the Virginia Child Support Enforcement Agency forwarded to West Virginia a RURESA petition seeking a determination of paternity and child support from the Respondent. The RURESA petition was served upon the Respondent, who then filed an answer containing affirmative defenses including, inter alia, (1) that some other individual fathered Travis; and (2) that Mr. Cline, the mother's former husband, had previously been adjudicated as Travis' father. Based on the second defense, the Respondent argued that the action was barred by res judicata.

1. The certified question provides as follows:
   Whether the statutes, caselaw or public policy of this State bar the instant action which seeks to establish paternity against the defendant for a minor child which is specifically mentioned in a final divorce decree entered in the State of Virginia between the plaintiff and her then-husband, Ronnie Cecil Cline, finding that Ronnie Cecil Cline is the father of the child.

2. RURESA was preceded by the Uniform Reciprocal Enforcement of Support Act ("URESA"). URESA was originally enacted in 1950. It was subsequently amended in 1952, 1958 and 1968. The breadth of the 1968 amendments were such that the National Conference of Commissioners on Uniform State Laws redesignated URESA as RURESA. *See generally Revised Uniform Reciprocal Enforcement of Support Act*, 9B U.L.A. 381, 382 (1987).
   By way of background, a RURESA proceeding like the one at issue commences when a person owed a duty of support files a petition in a court of the "[i]nitiating state," here Virginia. W.Va. Code § 48A–7–2(4). The initiating state then forwards the petition to a court located in the state where the parent allegedly liable for a duty of support resides. This second state is known as the "[r]esponding state." W.Va.Code § 48A–7–2(11). The court in the responding state then proceeds to ascertain whether a duty of support exists. W.Va.Code § 48A–7–23. A comprehensive discussion of the RURESA petition process can be found in *Commonwealth ex rel. Halsey v. Autry*, 293 Md. 53, 441 A.2d 1056 (1982).

3. The mother states as follows in her interrogatory answers: "So, in January of 1991 I had to bring it all out. I couldn't live with the fact that my son was growing up living a lie. Ronnie is not his father, and I don't think Travis should grow up thinking he is. It just isn't fair to Travis."

The Respondent filed a motion for summary judgment on March 3, 1993, on the grounds that the Virginia divorce decree barred the paternity action. The Petitioner countered that since the child was not a party to the divorce, nor was he represented, he was not barred by res judicata. The Circuit Court of Mercer County ruled for the Respondent and appointed a guardian ad litem for the child. Because the trial court ruled in favor of the Respondent and dismissed the petition, there was no evidence or testimony taken and no substantial discovery, such as blood grouping tests, performed. The Child Advocate Office requested that the question of whether the trial court erred in dismissing the RURESA petition be certified to this Court.

We discussed the question of res judicata as it related to paternity issues in *State ex rel. Division of Human Services v. Benjamin P.B.*, 183 W.Va. 220, 395 S.E.2d 220 (1990). That case involved a mother who caused a warrant to issue against the appellant in 1978, charging him with the paternity of a child. The circuit court entered an order, also in 1978, directing the appellee, the appellant, and the child to submit to blood grouping tests. However, the mother then filed a motion requesting that the circuit court withdraw the warrant and dismiss the action, which was done. Thereafter, in 1989, the mother, through the West Virginia Department of Human Services, filed a second paternity suit to obtain child support. The appellant moved to dismiss, claiming res judicata. *Id.* at 222, 395 S.E.2d at 222.

█ This Court held that res judicata did not bar the child's paternity action merely because a previous paternity action was instituted by the mother and was dismissed with prejudice. In syllabus point 5 of *Benjamin*, we stated as follows:

> The dismissal with prejudice of a paternity action initiated by a mother against a putative father of a child does not preclude the child, under the principle of *res judica-*

*ta*, from bringing a second action to determine paternity when the evidence does not show privity between the mother and the child in the original action nor does the evidence indicate that the child was either a party to the original action or represented by counsel or guardian ad litem in that action.

*Id.* at 221, 395 S.E.2d at 221.

This approach is attributable in large measure to the differing interests of mother and child in a paternity and support proceeding. These differing interests were discussed in *Benjamin* and *Commonwealth ex rel. Gray v. Johnson*, 7 Va.App. 614, 376 S.E.2d 787 (1989), a case that we cited with approval in *Benjamin*. The court in *Johnson* stated as follows:

> [W]hile the mother and child's rights may relate to the same subject matter, and may be coextensive to some extent, they are distinct....
>
> An actual distinction rests in the right to child support. It is well settled that both parents owe a duty of support to their child.... However, the duty of support of all children is owed to the child, not the mother.... Thus, the mother does not have the same legal right of the child in seeking child support....
>
> The child also has a fundamental right, not shared by the mother, to establish the father-child relationship, and in exercising that right there clearly is potential for conflict between the mother's interest and the child's interest.

*Id.* at 622, 376 S.E.2d at 791.[4]

Our prior cases recognize as much. For instance, we stated in syllabus point 4 of *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989), that "[a] guardian ad litem should be appointed to represent the interests of the minor child whenever an action is initiated to disprove a child's pater-

---

4. It does not appear that Mr. Cline objects to the instant paternity action nor the deleterious effect that it might have on his rights to or relationship with Travis. Certainly, however, he would be entitled to notice of any proceedings to sever his rights if his whereabouts are known. The more difficult issue, one which is not presented here and which need not be addressed at this time, would involve a paternity action affecting the parental rights of one (1) who has acted in a paternal capacity for a significant length of time, and (2) who desires to retain such rights.

nity." More recently, we have observed as follows:

> Although historically courts have addressed issues affecting children primarily in the context of competing adults' rights, *the present trend in courts throughout the country is to give greater recognition to the rights of children, including their right to independent representation in proceedings affecting substantial rights.*

*Cleo A.E. v. Rickie Gene E.,* 190 W.Va. 543, 546, 438 S.E.2d 886, 889 (1993) (emphasis added).

We think that the analysis in *Benjamin* applies with equal force to the instant case. Like *Benjamin,* there is no sufficient indication of privity between the mother and Travis in the prior proceeding. Further, it does not appear that anyone even acted to protect Travis' interests in that proceeding. Accordingly, we conclude that the Respondent's res judicata argument lacks merit.

There is a further substantial issue, however, that is implicitly raised by the circuit court's certified question. While the parties did not brief the issue, we feel compelled to address the jurisdictional question of whether the Petitioner can seek to establish the Respondent's paternity in a RURESA proceeding and under what circumstances.[5] At the outset, it is important to note one of the primary goals of RURESA is to furnish a liberal enforcement mechanism for the claims of (1) nonresident parents and children entitled to support and (2) foreign welfare departments which have made support payments to non-residents entitled to support. *Commonwealth ex rel. Halsey v. Autry,* 293 Md. 53, 57, 441 A.2d 1056, 1058 (1982). Thus, we are mindful that RURESA is remedial in nature and consequently must be afforded a liberal construction. *See id.* at 57, 441 A.2d at 1058–59.

■ On the question of paternity, West Virginia Code § 48A–7–26 provides as follows:

If the obligor asserts as a defense that he is not the father of the child for whom support is sought and it appears to the court that the defense is not frivolous, and if both of the parties are present at the hearing or the proof required in the case indicates that the presence of either or both of the parties is not necessary, the court may adjudicate the paternity issue. Otherwise the court may adjourn the hearing until the paternity issue has been adjudicated.

*Id.*

The language of § 48A–7–26 is identical to § 27 of RURESA. 9B U.L.A. 522, 523 (1987). Not surprisingly, courts interpreting § 27, or state statutes similar to it, have uniformly concluded that the provision allows a responding court to adjudicate the issue of paternity. *See Nancy Darlene M. v. James Lee M.,* 184 W.Va. 447, 452, 400 S.E.2d 882, 887 (1990) (stating in dicta that *"W.Va.Code,* 48A–7–26 [1986] allows a court to adjudicate the issue of paternity"); *see also, e.g., D.P. v. Stewart,* 189 Cal.App.3d 244, 247, 234 Cal. Rptr. 420, 421 (1987) (stating that a statute identical to § 27 was "an express provision authorizing the adjudication of paternity in a RURESA action"); *State v. Kuehlewind,* 570 So.2d 179, 181 (La.Ct.App.1990), *writ denied,* 573 So.2d 1134 (La.1991) (noting that a slightly modified version of § 27 required that "since paternity had been put at issue, ... [the court] was obliged to adjudicate the question"); *Borchers v. McCarter,* 181 Mont. 169, 173, 592 P.2d 941, 944 (1979), *abrogated on other grounds in State v. Sasse,* 245 Mont. 340, 801 P.2d 598 (1990) (stating "Montana has adopted the clear statutory language of section 27 of the Revised Uniform Act, leaving no question as to whether a court can determine paternity as part of a URESA action in this state"); *Lara v. County of Yolo ex rel. Constancio,* 104 Nev. 705, 707, 765 P.2d 1151, 1152 (1988) (quoting § 27 and stating that it "specifically state[s] that a

---

5. We implicitly answered this question in the affirmative last term in *Mildred L.M. v. John O.F.,* 192 W.Va. 345, 452 S.E.2d 436 (1994). The facts in *Mildred L.M.* are remarkably similar to those herein and involved a jury trial in a RURE-

SA paternity dispute. The sole issue on appeal was whether the jury's verdict was supported by the evidence, and we did not address the question presented herein.

court may determine paternity and order the payment of support").[6]

■ Given this authority, we conclude that, under § 48A–7–26, a circuit court in a RURESA proceeding in this state may adjudicate the issue of paternity if each of the following three statutory elements are satisfied: (1) the obligor asserts a defense that he is not the father of the child involved; (2) the circuit court concludes that the defense is not frivolous; and (3) "the parties are present at the hearing or the proof required in the case indicates that the presence of either or both of the parties is not necessary...." W.Va. Code § 48A–7–26.

The largely undeveloped record in this case places us at a severe disadvantage in determining whether at least one of the three § 48A–7–26 elements are satisfied. It is clear that the Respondent has asserted a defense that he is not Travis' father. Further, while the circuit court may reach a different conclusion as the case proceeds below, we cannot say at this time that the Respondent's defense appears frivolous. The element that presents some uncertainty, however, is whether the necessary parties, i.e., the mother, Travis and the Respondent, will be present at the hearing or the proof required in the matter will make their presence unnecessary. We presume, at the very least, that the Respondent will be present. If the mother and Travis are present as well, the circuit court may proceed to adjudicate the paternity issue. If the mother and Travis cannot travel to this state for the hearing, we will leave it to the circuit court in the first instance to determine whether the proof required indicates that the Clines' presence is required. If the circuit court concludes that they need not be present, it may adjudicate the paternity issue. If their presence is deemed necessary for some compelling reason, however, "the court may adjourn the

hearing until the paternity issue has been adjudicated." *Id.*

At this juncture, it we feel it incumbent on us to offer the parties and the circuit court some guidance in making the § 48A–7–26 "presence" inquiry. While there is not an abundance of case law on this issue, we have gleaned some helpful observations from leading commentators. William J. Brockelbank, chairman of the committee which acted for the National Conference of Commissioners on Uniform State Laws in preparing RURESA, states as a general matter:

> When the [paternity] defense is merely frivolous and can be easily met by a deposition from the plaintiff, the issue should be accepted and decided as any other issue might be. However, when the defendant makes a *substantial showing* that he is not the father and it appears that it will be very difficult to conduct such a trial with the plaintiff not before the court, there may be a point when the court is justified in refusing to go on. But dismissal should not follow automatically from the filing of such a defense but should result only from *weighing the equities and considering the convenience and justice to the parties.*

William J. Brockelbank & Felix Infausto, *Interstate Enforcement of Family Support* 62–63 (2nd ed. 1971) (emphasis added).

■ While this excerpt provides a good starting place for a responding court, the question still remains as to where the "point" lies that would justify a responding court "in refusing to go on." *Id.* We think, at the very least, prior to ruling on whether to "adjourn the hearing" to allow for a separate adjudication of the paternity question, that it is incumbent upon the responding court to order appropriate blood grouping tests to aid in (1) the determination of parentage; and (2) the determination of whether the physical presence of the relevant parties is required.[7]

---

**6.** Even absent the express authority granted by § 27, a majority of jurisdictions have held that the general language of URESA permits a responding court to adjudicate paternity. *See, e.g., Greenstreet v. Clark,* 239 N.W.2d 143 (Iowa 1976); *Clarkston v. Bridge,* 273 Or. 68, 539 P.2d 1094 (1975); *Yetter v. Commeau,* 84 Wash.2d 155, 524 P.2d 901 (1974); *see generally State ex rel. Dep't of Social Servs. v. Wright,* 736 S.W.2d

84, 85 (Tenn.1987) (collecting cases); Joel E. Smith, Annotation, *Determination of Paternity of Child as Within Scope of Proceeding Under Uniform Reciprocal Enforcement of Support Act,* 81 A.L.R.3d 1175 (1977).

**7.** It appears that the Commonwealth of Virginia has offered to pay for such testing with the

We understand that this approach will require testing at different interstate locations. That prospect, however, does not appear to be particularly cumbersome. One leading commentator provides some helpful insight on the mechanics of the interstate testing procedure, and we think it helpful to quote her at length:

> Interstate blood testing is not difficult to arrange. The petitioner's representative should contact the URESA state information agency to determine if there are any laboratories which the state prefers for performing interstate blood tests.... Often the laboratory, especially national laboratories, will have a representative who will assist the petitioner's attorney in coordinating the blood tests. Some national laboratories even have toll-free URESA "hot line" numbers.[1] The alleged father will have blood drawn in the responding jurisdiction. The natural mother and the child will have blood drawn in the initiating jurisdiction.
>
> The laboratory will coordinate the blood drawing dates so that they are sufficiently close in time to ensure proper testing. It is especially important in interstate cases that the laboratory not only require identification from the parties but also that it take photographs and/or fingerprints of the parties that appear for testing. Obligors have been known to send in their "buddies" to guarantee an exclusion.... Once the blood samples are drawn, they will be forwarded to one central location for testing.

Margaret C. Haynes, *The Uniform Reciprocal Enforcement of Support Act, in* Interstate Child Support Remedies 63, 87 (Margaret C. Haynes ed., 1989).

proviso that it be reimbursed by the Respondent if he is ultimately determined to be Travis' father.

8. West Virginia Code § 48A–7–20 provides as follows:

> If the obligee is not present at the hearing and the obligor denies owing the duty of support alleged in the petition or offers evidence constituting a defense, the court shall upon request of either party, continue the hearing to permit evidence relative to the duty to be adduced by either party by deposition or by appearing in person before the court. The court

Once the testing is completed, the circuit court will be in a better position to decide how best to proceed. For instance, the testing may exclude the putative parent from the pool of potential fathers. In that case, the circuit court would likely be justified in dismissing the RURESA petition. On the other hand, the undisputed laboratory results may so conclusively establish that the putative father is the parent of the child that no further inquiry is necessary. *See* Syl. Pt. *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994) (stating that "[u]nder W.Va.Code, 48A–6–3 (1992), undisputed blood or tissue test results indicating a statistical probability of paternity of more than ninety-eight percent are conclusive on the issue of paternity, and the circuit court should enter judgment accordingly."); *see also Lara*, 104 Nev. at 708, 765 P.2d at 1153 (stating "Modern medical tests of this nature are quite accurate, and do not require the presence of all parties in the same jurisdiction. They can readily provide the court with sufficient evidence to determine paternity").

We understand that in some cases, the test results will not provide definitive evidence of paternity. In those cases, the circuit court (1) should consider the equities, convenience and justice to the parties, and (2) should determine whether to adjourn the matter to allow for a determination of paternity in a separate proceeding with all relevant parties present. In making this determination, however, the circuit court should consider, inter alia, (1) RURESA's goal of furnishing a liberal, speedy and efficient enforcement mechanism for duties of support; and (2) the possibility of taking additional evidence via deposition pursuant to West Virginia Code § 48A–7–20.[8]

> may designate the judge of the initiating court as a person before whom a deposition may be taken.

*Id.* We would also note that the discovery devices contained in the Rules of Civil Procedure were made applicable to this case via a family law master's order of June 5, 1992. *See* R.Civ.P. 81(a)(2). Further, one commentator has observed that, in similar cases, "[a] few courts have also begun allowing the submission of evidence through video and/or telephone conferencing." Haynes, *supra* at 87.

On a final note, and as alluded to previously, we feel compelled to make one final observation given that it may become an issue once the case returns to the circuit court. If the circuit court ultimately determines that the Respondent is Travis' father, it may enter a corresponding order of support against the Respondent even though such an order was not previously entered in the initiating state. Although we are aware of contrary authority, the better-reasoned cases conclude that the duty of a parent to support a child is imposable by a responding state in a RURESA proceeding even though no previous order of support exists. *See, e.g., Hodge v. Maith,* 435 So.2d 387, 389 n. 5 (Fla.Dist.Ct.App.1983) (stating that "[w]hile URESA does not create a duty of support, it is *not necessary* that an action under the Act be based on a pre-existing judicial determination of support duty"); *Autry,* 293 Md. at 61, 441 A.2d at 1061 (stating "as conceded by the father here, a duty of support is imposable by a responding state court in a URESA proceeding even though no previous order of support exists") (citing cases); *England v. England,* 337 N.W.2d 681, 683 (Minn.1983) (stating that "[p]rovisions of URESA make clear that its applicability is not dependent on the existence of other proceedings"); *State ex rel. Petersen v. Miner,* 226 Neb. 551, 554, 412 N.W.2d 832, 834 (1987) (stating "URESA has often been interpreted to require application of the act in cases in which a duty to support a child is 'imposable' by either common law or statutory law"); *Lara,* 104 Nev. at 707, 765 P.2d at 1152 (stating "[t]he fact that [the respondent's duty to support his child from its birth] was not previously enforced does not mean it did not exist"); *Clarkston v. Bridge,* 273 Or. 68, 72, 539 P.2d 1094, 1096 (1975) (stating "[c]learly then, the URESA authorizes both the finding and the enforcement of duties of support

which have not been previously established in another proceeding").[9]

The reasoning behind these decisions is often based on the interpretation of RURESA § 2(b). West Virginia Code § 48A–7–2(2) is materially identical to § 2(b) and provides, in part, as follows:

(2) "Duty of support" means a duty of support *whether imposed or imposable by law or by order,* decree or judgment of any court, of competent jurisdiction, whether interlocutory or final, or whether incidental to an action for divorce, separation, separate maintenance or otherwise and includes the duty to pay arrearages of support past due and unpaid.

W.Va.Code § 48A–7–2(2) (emphasis added).

The above-cited case authority, as well as the obvious language of the statute, compels the conclusion that duties of support "are not limited to duties previously imposed by a sister state." *Petersen,* 226 Neb. at 553, 412 N.W.2d at 833. Rather, the duty may be imposed in the responding state according to the law existing in that state.[10] While it is true that RURESA does not create any duties of support in and of itself, the obligation of one to support his out-of-wedlock child has nothing to do with RURESA. That obligation is created by the common or statutory law of the responding state and is merely *enforceable* via RURESA. *Id.* at 554, 412 N.W.2d at 834; *see generally Autry,* 293 Md. at 53, 441 A.2d at 1056. This construction is compelled by the language of § 48A–7–2(2) and comports well with RURESA's broad remedial purpose.

There can be no question that there is an "imposable" duty of support under West Virginia law based on the facts herein. As stated, in part, in syllabus point 2 of *Kathy*

---

9. This conclusion also finds support from Professor Brockelbank, who has commented on the "misconception[ ]" that:

only *orders* of support of one state will be enforced in another under the Act.[ ] In fact ... the duty, of course, may grow out of the order of support or a judgment or decree but is equally a duty if it never has received judicial attention and now is the basis of litigation for the first time under the Act.

Brockelbank & Infausto, *supra* at 39.

10. *See, e.g., Autry,* 293 Md. at 59, 441 A.2d at 1059 (citing cases). This conclusion, of course, is buttressed by West Virginia Code § 48A–7–23, which states in pertinent part that "[i]f the circuit court, acting as a responding court, *finds a duty of support,* it may order the obligor to furnish support or reimbursement therefor and subject the property of the obligor to the order." *Id.* (emphasis added).

*L.B. v. Patrick J.B.*, 179 W.Va. 655, 371 S.E.2d 583 (1988), "[u]pon a judicial determination of paternity, the paternal parent shall be required to support his child under W.Va. Code, 48A–6–4 (1986), and may also be liable for reimbursement support from the date of birth of the child." *Id.; see* Syl. Pt. 2, in part, *Robinson v. McKinney*, 189 W.Va. 459, 432 S.E.2d 543 (1993) (stating that " '[t]he duty of a parent to support a child is a basic duty owed by the parent to the child' ") (quoted case omitted). Should the Respondent ultimately be found to have fathered Travis then, the circuit court may impose a duty of support on him, and order reimbursement support as well, pursuant to West Virginia Code § 48A–7–23.

In accordance with the above analysis, the circuit court is, in sum, directed in the first instance to order blood grouping tests of the relevant parties. Next, the court should review the results of those tests to determine whether judgment might be entered for either party as a matter of law. If the court determines that the tests are inconclusive, it must then ascertain, given the equities, convenience, justice to the parties, and the other factors outlined above, whether it should proceed to adjudicate the paternity issue or adjourn the proceeding to allow for a separate adjudication of the question. Finally, if the Respondent is ultimately adjudicated to be Travis' father, the circuit court is directed to impose an appropriate duty of support.

Having answered the certified question posed by the circuit court, we dismiss the case from this Court's docket.

Certified Question Answered; Case Dismissed.

BROTHERTON, J., did not participate.

MILLER, J., sitting by temporary assignment.