569 S.E.2d 77

In re the MARRIAGE/CHILDREN OF:
BETTY L.W., Plaintiff/Respondent
Below, Appellee,

v.

WILLIAM E.W., Defendant/Petitioner
Below, Appellant.

No. 30189.

Supreme Court of Appeals of
West Virginia.

Submitted May 22, 2002.

Decided June 7, 2002.

Dissenting Opinion of Justice
Maynard July 2, 2002.

**4**

Howard M. Ferris, Grafton, West Virginia, for appellee.

Kevin T. Tipton, Clagett & Gorey, Fairmont, West Virginia, for appellant.

Darrell V. McGraw, Jr., Attorney General, Kimberly D. Bentley, Assistant Attorney General, Charleston, West Virginia, for the Bureau of Child Support Enforcement.

PER CURIAM.

This is an appeal by William E.W. (hereinafter "Appellant")[1] from a June 22, 2001, order of the Circuit Court of Taylor County denying his petition to modify child support. The Appellant had discovered, through DNA testing, that he was not the father of a child for whom he had been paying child support. The lower court denied the petition on the basis of *res judicata*, ruling that the paternity issue had been determined by the Appellant's admission of paternity and the divorce decree stating that he was the child's father. On appeal, the Appellant contends that his challenge to the paternity finding should be permitted. Having thoroughly reviewed the record and the arguments of counsel, we affirm the determination of the lower court.

### I.  Facts

A divorce action was instituted by Mrs. Betty L.W. against the Appellant in July 1996. Mrs. W. alleged that three children had been born of the parties' marriage, Ruth, born March 9, 1981; Stacy, born December 30, 1984; and Crystal, born October 10, 1989. In his answer, the Appellant admitted that three children had been born of the marriage. An agreed divorce order, filed December 6, 1996, also stated that three children had been born of the marriage.[2]

In March 2001, the Appellant discovered through DNA testing that he was not Crystal's biological father. On March 27, 2001, the Appellant filed a petition to modify/terminate child support on the ground that Crystal

---

1. As in all sensitive matters involving the rights of children, we use only initials in reference to the names of the people involved. *See, e.g., In the Matter of Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991).

2. Custody of Stacy and Crystal was originally granted to the mother. The Appellant was originally granted custody of Ruth, the oldest child. Custody arrangements were altered occasionally from 1996 through 2001, with the Appellant gaining custody of Stacy and the mother gaining custody of Ruth. Throughout those alterations, the Appellant has never had custody of Crystal. While the record does not reveal the extent to which the Appellant exercised his fixed visitation rights with Crystal, counsel stated during oral argument that the Appellant had exercised his visitation rights.

was not his child.[3] Subsequent to a May 9, 2001, hearing before the family law master, the Appellant's petition was denied on the basis of *res judicata* because paternity had been established in the divorce decree. By order dated June 22, 2001, the lower court affirmed the decision of the family law master, and the Appellant now appeals to this Court.

The Appellant contends that a child's best interests[4] are not served by dismissing a petition to modify child support when the alleged father has learned that he is not the biological father. The Appellant further requests this Court to revisit our holding in *Nancy Darlene M. v. James Lee M., Jr.*, 184 W.Va. 447, 400 S.E.2d 882 (1990), in light of what he perceives to be its inherent unfairness and its incompatibility with principles applied in one of this Court's most recent paternity cases, *State ex rel. Department of Health and Human Resources v. Michael George K.*, 207 W.Va. 290, 531 S.E.2d 669 (2000).

## II. Standard of Review

■■■ Where lower court rulings are primarily based upon matters of legal interpretation, this Court employs a *de novo* standard of review. *See Michael George*, 207 W.Va. at 294, 531 S.E.2d at 673. This approach was concisely stated in syllabus point one of *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995), as follows:

> In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable dis-

tribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

## III. Discussion

■■■ This Court's contemplation of paternity matters has generated several decisive principles in this significant area of the law. While our decision in *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989), did not specifically address issues of *res judicata*, the reasoning of that opinion is relevant to our present inquiry and serves as a prefatory instrument of analysis. In *Michael K.T.*, this Court emphasized the necessity for concentration upon the rights[5] of the child and explained as follows in syllabus point two:

> When a putative father seeks to use blood test results to disprove his paternity and rebut the presumption of legitimacy which has attached to a child born of a valid marriage, an *in camera* hearing should be held in order for the circuit court to make a preliminary determination whether the equities surrounding the particular facts and circumstances of the case warrant admission of blood test results.

This Court based that ruling "upon the inherent inequity which results when a man is forced to bear the financial burden of child support when he did not father the child or knowingly hold the child out to be his own." *Id.* at 404, 387 S.E.2d at 871. In syllabus point three of *Michael K.T.*, this Court ex-

---

3. The Bureau of Child Support alleges in its brief that it is unaware of the conditions under which the Appellant informed Crystal that she was not his biological child, but the Bureau does acknowledge that the Appellant has informed Crystal of that fact.

4. An analysis of the best interests of the child has consistently been required by this Court in matters impacting the rights of children. In *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996), for instance, this Court addressed the legal requirements for standing of a putative biological father to raise the issue of paternity of a child born to a married woman, not his wife. In examining the general paternity issues, this Court reiterated that the "[p]reemi-

nent factor in deciding whether to grant or deny blood testing is the child's best interests." *Id.* at 638, 474 S.E.2d at 568. The *Roy Allen* Court also observed that paternity cases "require the exercise of sensitivity and discretion in the analysis of a range of factors that can vary widely from case to case in terms of their applicability and importance." *Id.* at 639, 474 S.E.2d at 569.

5. The child's rights were also addressed in syllabus point three, in part, of *Cleo A.E. v. Rickie Gene E.*, 190 W.Va. 543, 438 S.E.2d 886 (1993), as follows: "A child has a right to an establishment of paternity and a child support obligation[.]" *See also* Syl. Pt. 5, *Child Support Enforcement Div. v. Prichard*, 208 W.Va. 762, 542 S.E.2d 925 (2000).

plained that a trial court "should refuse to admit blood test evidence which would disprove paternity when the individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child." Syllabus point four of *Michael K.T.* also provided the requirement that "[a] guardian *ad litem* should be appointed to represent the interests of the minor child whenever an action is initiated to disprove a child's paternity." 182 W.Va. at 400, 387 S.E.2d at 867.[6]

The precise issue of the preclusive effect of principles of *res judicata* upon prior findings of paternity was raised in 1990 in *Nancy Darlene*. In that pivotal case, this Court encountered an argument substantially similar to that forwarded by the Appellant in this case. The alleged father and former husband in *Nancy Darlene* had sought to terminate child support payments, despite the existence of an acknowledgment in the divorce order that he was the father of the

child in question. 184 W.Va. at 448, 400 S.E.2d at 883. The mother contended that the alleged father was "barred from challenging that issue of paternity because he did not appeal this issue within the then-prescribed period of eight months." *Id.* at 450, 400 S.E.2d at 885. This Court agreed, relying upon precedent and general principles of *res judicata,*[7] and held that " 'adjudication in a divorce or annulment action concerning the paternity of a child is res judicata as to the husband or wife in any subsequent action or proceeding.' " *Id., quoting* Annotation, *Effect, in Subsequent Proceedings, of Paternity Findings or Implications in Divorce or Annulment Decree or in Support or Custody Order Made Incidental Thereto,* 78 A.L.R.3d 846, 853 (1977).[8]

This Court in *Nancy Darlene* also relied upon principles enunciated in *N.C. v. W.R.C.,* 173 W.Va. 434, 317 S.E.2d 793 (1984), in which the husband had petitioned the circuit court for relief from child support payments, alleging that he was not the father of the parties' child. In *N.C.,* this Court affirmed

6. *See also State ex rel. Dep't of Health and Human Resources v. Cline,* 185 W.Va. 318, 406 S.E.2d 749 (1991) (granting writ of prohibition to DHHR to prevent enforcement of circuit court order directing blood testing seven years after jury determination of paternity).

7. In syllabus point one of *In re Estate of McIntosh,* 144 W.Va. 583, 109 S.E.2d 153 (1959), this Court summarized established principles of the doctrine of *res judicata* as follows:

"An adjudication by a court having jurisdiction of the subject-matter and the parties is final and conclusive, not only as to the matters actually determined, but as to every other matter which the parties might have litigated as incident thereto and coming within the legitimate purview of the subject-matter of the action. It is not essential that the matter should have been formally put in issue in a former suit, but it is sufficient that the *status* of the suit was such that the parties might have had the matter disposed of on its merits. An erroneous ruling of the court will not prevent the matter from being *res judicata.*" Point 1, Syllabus, *Sayre's Adm'r v. Harpold,* 33 W.Va. 553 [, 11 S.E. 16 (1890)].
Syllabus point four of *Blake v. Charleston Area Medical Center, Inc.,* 201 W.Va. 469, 498 S.E.2d 41 (1997), also provided the elements of *res judicata,* as follows:

Before the prosecution of a lawsuit may be barred on the basis of *res judicata,* three elements must be satisfied. First, there must have been a final adjudication on the merits in the

prior action by a court having jurisdiction of the proceedings. Second, the two actions must involve either the same parties or persons in privity with those same parties. Third, the cause of action identified for resolution in the subsequent proceeding either must be identical to the cause of action determined in the prior action or must be such that it could have been resolved, had it been presented, in the prior action.

8. The *Nancy Darlene* Court observed as follows:

This principle is recognized throughout American jurisdictions. *See De Weese v. Unick,* 102 Cal.App.3d 100, 162 Cal.Rptr. 259 (1980); *Garcia v. Garcia,* 148 Cal.App.2d 147, 306 P.2d 80 (1957); *Johnson v. Johnson,* 395 So.2d 640 (Fla. Dist.Ct.App.1981); *In re Marriage of Detert,* 391 N.W.2d 707 (Iowa Ct.App.1986); *Baum v. Baum,* 20 Mich.App. 68, 173 N.W.2d 744 (1969); *In re Marriage of Campbell,* 741 S.W.2d 294 (Mo.Ct. App.1987); *Withrow v. Webb,* 53 N.C.App. 67, 280 S.E.2d 22 (1981); *Arnold v. Arnold,* 207 Okla. 352, 249 P.2d 734 (1952); *Com. ex rel. Palchinski v. Palchinski,* 253 Pa.Super. 171, 384 A.2d 1285 (1978); *Johns v. Johns,* 64 Wash.2d 696, 393 P.2d 948 (1964); *E v. E,* 57 Wis.2d 436, 204 N.W.2d 503 (1973). *See also* 24 Am.Jur.2d *Divorce and Separation* § 1099, at 1084 (1983) ("If the paternity of a child is placed in issue in an action for a divorce and is adjudicated, the matter is res judicata as between the husband and wife in any subsequent action or proceeding[.]").

the circuit court's decision that the husband was not entitled to relief because he had failed to raise "the issue of paternity through appropriate proceedings prior to the final disposition" of the divorce. 173 W.Va. at 438, 317 S.E.2d at 797.

In *Nancy Darlene*, this Court also examined the issue of finality in paternity determinations and reasoned as follows:

> If we were to recognize that the appellee could continue to raise the issue of paternity nearly five years after the birth of his putative daughter, then our domestic relations law would be replete with cases in which paternity is denied, and, consequently, child support payments, necessary for the daily needs of children's lives, would never be met.

184 W.Va. at 451, 400 S.E.2d at 886.[9] This Court concluded as follows in syllabus point one of *Nancy Darlene*:

> An adjudication of paternity, which is expressed in a divorce order, is *res judicata* as to the husband and wife in any subsequent proceeding. Therefore, the provisions of *W.Va.Code*, 48A–7–26 [1986], part of the Revised Uniform Reciprocal Enforcement of Support Act, W.Va.Code, 48A–7–1 to 48A–7–41, as amended, which authorizes the adjudication of paternity under certain circumstances is not applicable if an adjudication of paternity is expressed in the divorce order.

*Id.* at 448, 400 S.E.2d at 883.

The rights of the child and the absence of *res judicata* preclusion of challenges initiated by or on behalf of the child were addressed by this Court in *State ex rel. Dep't of Health and Human Resources v. Penta-suglia*, 193 W.Va. 621, 457 S.E.2d 644 (1995). In *Pentasuglia*, this Court found that because the child had not been a party to the initial divorce action, principles of *res judicata* would not operate to preclude a support action filed by the child against another putative father. *Id.* at 622, 457 S.E.2d at 645. This ruling was also consistent with syllabus point five of *State ex rel. Div. of Human Servs. v. Benjamin P.B.*, 183 W.Va. 220, 395 S.E.2d 220 (1990) ("The dismissal with prejudice of a paternity action initiated by a mother against a putative father of a child does not preclude the child, under the principle of *res judicata*, from bringing a second action to determine paternity when the evidence does not show privity between the mother and the child in the original action nor does the evidence indicate that the child was either a party to the original action or represented by counsel or guardian ad litem in that action."). Elaborating upon this assertion from *Benjamin P.B.*, the *Pentasuglia* Court observed that " '[t]he child also has a fundamental right, not shared by the mother, to establish the father-child relationship, and in exercising that right there clearly is potential for conflict between the mother's interest and the child's interest.' " 193 W.Va. at 624, 457 S.E.2d at 647, *quoting Commonwealth, Dep't of Social Serv. v. Johnson*, 7 Va.App. 614, 376 S.E.2d 787, 791 (1989).[10]

In *William L. v. Cindy E.L.*, 201 W.Va. 198, 495 S.E.2d 836 (1997), this Court employed the approach utilized in *Michael K.T.*, and concluded that a husband in a divorce proceeding could not use blood tests to disprove paternity because he had acted as the child's father for a number of years during the marriage. The father-child relationship

---

184 W.Va. at 450, 400 S.E.2d at 885.

**9.** The Court relied upon the reasoning of *Withrow v. Webb*, 53 N.C.App. 67, 280 S.E.2d 22 (1981), a case in which the North Carolina court explained as follows:

> Even if the principle of *res judicata* were not applicable, it would seem to us that to grant the motion for a blood-grouping test on this record, would open the door to unwarranted challenges of paternity, violate public policy, and clearly result in irreparable harm to the child whose parents appear to be bent on harassing one another.

280 S.E.2d at 26.

**10.** The Virginia court further explained as follows in *Johnson* explained:

> [W]hile the mother and child's rights may relate to the same subject matter, and may be coextensive to some extent, they are distinct....
>
> An actual distinction rests in the right to child support. It is well settled that both parents owe a duty of support to their child.... However, the duty of support of all children is owed to the child, not the mother.... Thus, the mother does not have the same legal right of the child in seeking child support....

**8**

had existed for four years, and the father had been on notice that he might not be the biological father of the child for approximately four years prior to his challenge to paternity. *Id.* at 201, 495 S.E.2d at 839. The Court in *William L.* noted that " 'the law favors the innocent child over the putative father in certain circumstances.' " *Id.* at 200, 495 S.E.2d at 838, *quoting Michael K.T.*, 182 W.Va. at 405, 387 S.E.2d at 872.

It is upon one of our most recent cases, *State ex rel. Department of Health and Human Resources v. Michael George K.*, 207 W.Va. 290, 531 S.E.2d 669 (2000), that the Appellant principally relies in support of his contention that *res judicata* should not prevent a reassessment of this paternity matter. In *Michael George*, the document which originally contained a finding of paternity was a paternity acknowledgment, rather than a divorce answer and decree as in the present case. The mother in *Michael George* was married to Mr. K. at the time of the child's birth, but she refused to list a father on the birth certificate, and Mr. K. filed for divorce prior to the child's birth.

The mother and Mr. K. agreed to a divorce order stating that no children had been born of the marriage. Two weeks after the child's birth, the mother and Mr. C. signed a notarized paternity acknowledgment stating that Mr. C. was the biological father. The Child Support Enforcement Division thereafter instituted a legal proceeding on behalf of the child against Mr. C. However, subsequent blood testing revealed that Mr. C. was not the biological father of the child. Consequently, the Division instituted an action on behalf of the child against Mr. K., and blood testing indicated that Mr. K. was the child's biological father. 207 W.Va. at 293, 531 S.E.2d at 672.

Subsequent to a lower court child support order against Mr. K., Mr. K. appealed to this Court seeking to avail himself of the preclusive *res judicata* effects of the paternity acknowledgment signed by Mr. C. and the divorce decree stating that no children had been born of the marriage between the mother and Mr. K. This Court examined Mr. K.'s contentions and concluded that the Mr. C.'s paternity acknowledgment did not preclude the biological father's obligation to pay child support. This Court also found that Mr. K. could not rely upon the "implicit decree of non-paternity" issued in connection with Mr. K.'s divorce from the mother stating that no children had been born of the marriage. 207 W.Va. at 299, 531 S.E.2d at 678. We observed that "our cases have consistently held that such decrees or determinations are not *res judicata* and do not inure to the benefit of a putative parent in an action brought *on behalf of the child* to obtain support." 207 W.Va. at 299, 531 S.E.2d at 678.[11]

The Appellant in the present case maintains that it would be fundamentally unfair for this Court to permit a challenge, in an action such as *Michael George*, to a paternity finding contained in a statutory paternity

---

376 S.E.2d at 791.

11. Syllabus point one of *Michael George* provided as follows:

After the statutory period of time during which a paternity acknowledgment made pursuant to *W.Va.Code*, 48A–6–6 [1997] may be rescinded has passed, proof by clear and convincing evidence of fraud, duress, material mistake of fact, or similar circumstance raising serious equitable concerns is a necessary prerequisite for a court to entertain a challenge to the validity and effectiveness of such a paternity acknowledgment.

Syllabus point two explained:

In considering the merits of a challenge to a paternity acknowledgment made pursuant to *W.Va.Code*, 48A–6–6 [1997], a court's decision whether to render the acknowledgment invalid or ineffective is to be made only after consideration of all applicable preferences, presump-

tions, and equitable principles established in our paternity jurisprudence, with the best interests of the child being a paramount consideration. To the extent that Syllabus Point 2 of *State ex rel. W.Va. DHHR on Behalf of Laura F.M. v. Cline*, 197 W.Va. 79, 475 S.E.2d 79 (1996) differs from this holding, it is hereby modified.

Syllabus point two of *State ex rel. Department of Health and Human Resources v. Cline*, 197 W.Va. 79, 475 S.E.2d 79 (1996), as referenced in the above syllabus point, held as follows:

Absent a judicial determination that an acknowledgment of paternity was entered into under fraud or duress, a written notarized acknowledgment by both the man and woman that the man is the father of the named child legally and irrevocably establishes the man as the father of the child for all purposes including child support obligations.

acknowledgment and foreclose a challenge to a paternity finding contained in a divorce decree. While that argument might be facially persuasive, it deteriorates upon close examination based upon the existence of several critical points of distinction between *Michael George* and the present case. The distinctions involve two primary areas: (1) the posture in which the challenge to the prior paternity finding was brought, and (2) the factual circumstances regarding the existence and extent of a father/child relationship.

In the present case, the challenge was initiated by a party to the civil action in which the original paternity finding was made. In *Michael George*, it was a child services agency, on behalf of the child, which initiated an action of paternity against a man other than the one signing the paternity acknowledgment. Such distinction is of critical importance to the analysis of the applicability of principles of *res judicata* since the preclusive effect of *res judicata* attaches only to parties to the original action.

In *Michael George*, once the action was initiated by the child services agency, it was the man against whom the action was taken who sought to utilize the prior finding of paternity as a shield, arguing that principles of *res judicata* would prevent the disestablishment of paternity against one man and the establishment of paternity in another. As explained above, it is axiomatic that principles of *res judicata* attach only to the parties involved in the initial civil action; other parties, such as the child or another individual, are specifically not precluded by *res judicata* from subsequent litigation of the paternity issue.[12] This is a universal holding

embraced by this Court in syllabus point five of *Benjamin P.*, as quoted above, and reviewing courts of other jurisdictions. See *Ruddock v. Ohls*, 91 Cal.App.3d 271, 154 Cal.Rptr. 87 (1979) (holding that child is not bound by paternity determination in marital dissolution action); *Dep't of Health and Rehabilitative Services v. Wyatt*, 475 So.2d 1332, 1334 (Fla.Dist.Ct.App.1985) (finding that child not party to first action not barred by *res judicata* because child and mother are not in privity due to divergent interests); *In re M.D.H.*, 437 N.E.2d 119, 130 (Ind.Ct.App. 1982) (finding *res judicata* inapplicable to child support petition of child because earlier action was not filed by or in the name of the child); *Baker by Williams v. Williams*, 503 So.2d 249, 254–55 (Miss.1987) (holding that adjudication of paternity in divorce decree is not binding on the child).

Thus, the difference in result between the present case and *Michael George* is based upon the proper application of principles of *res judicata* rather than upon any inequity in the treatment of individuals signing a paternity acknowledgment or admitting paternity in a divorce decree. In *Michael George*, the revisitation of the paternity finding was initiated on behalf of the child against a man not a party to the paternity acknowledgment. In the present case, the action was brought by a party to the initial paternity finding, and consequently, the principles of *res judicata* apply to preclude this action.

A second distinction between this case and *Michael George* involves the passage of time and the issue of the existence and extent of a father/child relationship. Mr. C., the man who signed the paternity acknowledgment in *Michael George*, did so two weeks after the

---

12. The inapplicability of principles of *res judicata* in a situation similar to the facts of *Michael George* was discussed by the Supreme Court of Nebraska in *State ex rel. Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998). In that case, the court reasoned as follows:

Filbert [the biological father] claims that because Hopkins' [the mother's ex-husband] paternity was adjudicated in the dissolution action, the State's claim that he is Keith's biological father is barred by the doctrine of res judicata. Res judicata bars relitigation of any right, fact, or matter directly addressed or necessarily included in a former adjudication

if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions. *DeVaux v. DeVaux*, 245 Neb. 611, 514 N.W.2d 640 (1994). As Filbert conceded in his brief, the fourth essential element of res judicata is not present in this case because he was not a party to the dissolution proceeding. Therefore, the decree in that proceeding does not bar the claim asserted against him in this case.

573 N.W.2d at 431–32.

child's birth. 207 W.Va. at 292, 531 S.E.2d at 671. No extensive father/child relationship had developed between Mr. C. and the child. Mr. C. contested his paternity within approximately six months, and this Court found that "[i]t seems unlikely that Mr. C. had held himself out as the child's father to such an extent as to make permitting Mr. C. to deny paternity inequitable because such denial would be undeniably harmful to the best interests of the child." 207 W.Va. at 298–99, 531 S.E.2d at 677–78. Thus, the Court rejected Mr. K's argument that a child support action could not be maintained against him.

■ By contrast, in the present case, Crystal was eleven years of age when the Appellant challenged a paternity finding entered over four years earlier.[13] He had maintained a normal father/daughter relationship with her and her sisters for over six years prior to the divorce and had exercised visitation privileges with her subsequent to the divorce. As stated above, the crux of this Court's opinion in *Michael K.T.* was that a reviewing court must examine the issue of whether an "individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child." 182 W.Va. at 404, 387 S.E.2d at 871. In *Pentasuglia*, this Court observed as follows:

> "Although historically courts have addressed issues affecting children primarily in the context of competing adults' rights, *the present trend in courts throughout the country is to give greater recognition to the rights of children, including their right to independent representation in proceedings affecting substantial rights.*"

193 W.Va. at 625, 457 S.E.2d at 648, *quoting Cleo A.E. v. Rickie Gene E.,* 190 W.Va. 543, 546, 438 S.E.2d 886, 889 (1993). In *Wade v. Wade,* 536 So.2d 1158 (Fla.Dist.Ct.App.1988), the Florida court refused to vacate a paternity finding where the father "enjoyed the benefits of his representation as the child's father, including the child's love and affection, his status as father in the place of the natural father, and the community's recognition of him as the father." *Id.* at 1160. Similarly, the controlling interests of the child were acknowledged in *In re Paternity of Cheryl,* 434 Mass. 23, 746 N.E.2d 488 (2001), wherein the court found that a five and one-half year interval between entry of the paternity judgment and the motion to vacate the judgment was not a reasonable time within which to seek relief and that "as a consequence of the father's long delay before he challenged the paternity judgment, Cheryl's interests now outweigh any interest of his." *Id.* at 497.

While the record before the Court in the present case does not provide extensive information concerning the nature of the post-divorce father/daughter relationship, it is apparent that the Appellant held himself out to be Crystal's father and resided with her, his wife, and his other two daughters for the first six years of Crystal's life. He thereafter continued to maintain a relationship at least through the exercise of visitation privileges. Thus, the Appellant's attempt to compare the present case to *Michael George* also fails on the issue of the relationship between the father and the child and the analysis of the best interests of the child.

Having examined the preclusive effects of principles of *res judicata* and the factual circumstances of the present case, this Court is assured that the judgment of the lower court was not in error. It is consistent with the principles we have embraced throughout our numerous evaluations of the complexities of paternity issues and is also consonant with the principles utilized in *Nancy Darlene* and *Michael George.* We consequently affirm the lower court's decision.

Affirmed.

MAYNARD, Justice, dissenting.

---

13. While the Appellant did not attempt to utilize Rule 60(b) to set aside the paternity finding, we note that Rule 60(b) would grant relief in very limited circumstances within specific time frames. *See* W.Va.R.Civ.Pro 60(b). It appears that the four-year delay between the order and the challenge would not have warranted Rule 60(b) relief. The Appellant did not allege fraud in the procurement of the finding of paternity in the divorce decree. *See, e.g., G.M. v. R.G.,* 211 W.Va. 528, 566 S.E.2d 887 (2002) (remanding for consideration of the alleged father's claim of fraud in connection with his paternity acknowledgement).

(Filed July 8, 2002)

This case raises several significant questions on which the majority and I strongly disagree. First, should any man, rich or poor, be legally and financially responsible for a child that absolutely is not his and that he did not father?

Second, do children have a right to know the identity of their biological fathers?

Finally, should courts hold mothers accountable when they deliberately make patently false statements? I would like to examine how the majority opinion answers each of these questions, and how I would answer them differently.

The majority opinion is based on *res judicata*. In other words, the majority says that because William E.W. did not challenge paternity during his divorce proceedings or appeal the issue of paternity during the statutory four-month time period, he is *forever* foreclosed from litigating the paternity issue even in light of new facts. The result is that William E.W. must financially support Crystal, who is undisputedly not his child, until she reaches adulthood. According to the majority, this result is compelled by Syllabus Point 1 of *Nancy Darlene M. v. James Lee M., Jr.*, 184 W.Va. 447, 400 S.E.2d 882 (1990), which states, in part, "An adjudication of paternity, which is expressed in a divorce order, is *res judicata* as to the husband and wife in any subsequent proceeding."

In *Nancy Darlene M.*, the putative father, James Lee, observed his wife, Nancy Darlene, having sex with another man before she discovered that she was pregnant with L.D.M. Nancy Darlene M. subsequently told James Lee that he was not the father of the unborn child. Nevertheless, during divorce proceedings, James Lee opined that he *was* the father of the child. As a result, the divorce decree stated as much. James Lee did not challenge paternity until a hearing was held on his failure to pay child support. At that point, James Lee was required to undergo blood tests. This Court held that the original divorce decree was *res judicata*, and the trial court should not have ordered or considered blood tests to determine paternity.

The facts of *Nancy Darlene M.* are very different from the facts of the instant case. When Betty L.W. instituted a divorce action against William E.W., she alleged that the three children, including Crystal, were born of the parties' marriage. Unlike James Lee, William E.W. had no reason to question the paternity of the children. Accordingly, he admitted paternity of the three children, and this was indicated in the December 6, 1996 divorce order. It was not until March 2001, when the appellant discovered through DNA testing that he was not Crystal's biological father, that he challenged his support of Crystal. Despite the significant differences between *Nancy Darlene M.* and the instant case, the majority rigidly insists on taking the overbroad rule articulated in *Nancy Darlene M.* and awkwardly imposing it on the present set of facts.

Although I generally concur with the application of *res judicata* principles to promote finality in judgments, in cases like the instant one, the application of *res judicata* should be modified when it conflicts with the state interest in preventing paternity fraud. According to Black's Law Dictionary, 660 (6th ed.1990), fraud is "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." This case is a perfect example of paternity fraud. Betty L.W. represented to William E.W. and to the court that William E.W. was the biological father of Crystal. This representation was made despite the fact that Betty L.W. knew there was either a possibility that William E.W. was not Crystal's father or that he absolutely was not her father. Betty L.W. made this representation so that she could collect child support from William E.W. on behalf of Crystal. Therefore, Betty L.W. intentionally perverted the truth concerning Crystal's paternity for the purpose of inducing William E.W. to pay child support. As I said previously in my dissent in *William L. v. Cindy E.L.*, 201 W.Va. 198, 204, 495 S.E.2d 836, 842 (1997), "fraudulent conduct exists in every case where a wife gives birth to a child cognizant of the fact that paternity is uncertain, yet

remains silent while her husband innocently assumes the care of the child."

This brings us back to the three questions asked above. First, the majority believes that a man should be responsible for a child that he absolutely did not father, regardless of the circumstances. I, on the other hand, believe that, instead of applying an overbroad and ironclad rule, the Court should take into consideration the circumstances of each case. For example, I understand and cannot really take issue with this Court's decision in *Nancy Darlene M.* based on the law of estoppel. If a man willingly holds himself out to be the biological father of a child despite knowledge to the contrary, he may be estopped from subsequently disavowing paternity. In the instant case, however, William E.W. innocently admitted paternity based on the fraudulent misrepresentations of Betty L.W. Therefore, I do not believe that he should be legally and financially responsible for Crystal.

Second, when there is a final divorce order indicating paternity of a child which is later determined to be false, the majority believes that the child does not have the right to know the identity of his or her biological father. Instead, the extent of the child's knowledge is bound by a legal document and the doctrine of *res judicata.* Again, in contrast, I believe that in certain circumstances, such as where fraud exists, the child has the right to know her biological father's identity. For example, it may be of the utmost importance for a child to know his or her biological father's medical history. And, if that biological father should die, that child has a right to inherit from his estate and to collect monthly social security checks until emancipated. We will just ignore the child's rights in that area says the majority.

Third, the majority does not believe that mothers should be held accountable when they deliberately make patently false and fraudulent statements. Rather, the majority opinion has the effect of permitting mothers who commit paternity fraud to continue to receive the ill-gotten fruits of their fraudulent conduct. I, in contrast, believe that fraud should be punished, and its victims should be relieved of their obligations that were induced by fraud.

Apparently, the idea of paternity fraud does not trouble the majority. Nevertheless, it should. Consider this. In 1999 alone, almost one-third of 280,000 paternity cases evaluated by the American Association of Blood Banks excluded the individual tested as the biological father of the child. In a period of only one year, that is almost 100,-000 men who were falsely accused of being the father of a child which they simply did not father. And that is only one year!

Some states are currently acting on the issue of paternity fraud. For example, Georgia enacted legislation in May 2002 which allows a man to stop paying court-ordered child support if DNA tests prove he did not father the child in question. That bill passed both houses of the Georgia legislature by huge margins. David Gary, writing for the Associated Press, says that according to the National Conference of State Legislatures, more than a dozen states now allow disestablishment of paternity in some circumstances based on genetic testing. Some states have time limits, but the Georgia law and a similar law passed in Ohio in 2000 do not.

Notably, in Vermont, Representative Leo Valliere introduced a bill that would not only stop the child support, it would also create a new crime called "paternity fraud." The bill provides that those who knowingly make false accusations of paternity could be jailed. If that result is too harsh for some, and it is too harsh for me, certainly we can find a middle ground between jailing those who intentionally misrepresent paternity and rewarding them for their deception.

The majority, however, obviously subordinates the punishment of paternity fraud and the relief of its victims to what it considers to be the best interests of the child. The majority and I do not agree on what constitutes the best interests of the child in this case. If the best interests of the child consist only in receiving a check in the mail every month, the majority may be correct. I, on the other hand, believe the best interests of a child include the opportunity to know and have a meaningful relationship with his or her biological father and the

biological father's extended family. I urge the reader to consider his or her own family relationships with grandparents, aunts, uncles, cousins, etc. How would you like not having, not knowing, and not loving all those folks in your family? That is exactly what we are taking away from children when we do not give them their real families. In addition, the best interests of a child consist of knowing his or her biological families' medical history. Finally, a child's best interests are in not being exposed to the bitterness and anger of a man who supports a child as a result of fraud and is then legally compelled to continue such support even when the truth is revealed. In the instant case, I believe it is in Crystal's best interests to know who her real father is and to be given the opportunity to develop a relationship with her biological father and his relatives. As I said in *William L. v. Cindy E.L.*, 201 W.Va. at 204, 495 S.E.2d at 842:

> This Court ... simply by the entry of a court order, cannot compel the giving of love and affection any more than it can change the weather. The Court's poor powers in this area are limited to ensuring continued financial support. Such financial support is, of course, beneficial to the child, but falls far short of what constitutes the child's best interests.

In conclusion, the majority opinion has the effect of permitting a woman in West Virginia to conceive a child as the result of an adulterous relationship, misrepresent the child's paternity by lying to her estranged husband in order to receive child support payments, and, as a result of this deliberate fraud, induce the victim to pay a substantial sum of money every month for a period of many years. Further, the victim is powerless to relieve himself of this obligation even if he can prove the fraud in a court of law. This is not simply injustice, it is justice turned bottom side up. Accordingly, I dissent.