980 A.2d 448

**Darren Gerard KAMP**

v.

**DEPARTMENT OF HUMAN SERVICES, Garrett County Department of Social Services, Bureau of Support Enforcement, Ex Rel Vicki Jo Duckworth.**

**No. 81, Sept. Term, 2008.**

Court of Appeals of Maryland.

Sept. 21, 2009.

G. Gary Hanna (Law Office of G. Gary Hanna of Cumberland), on brief, for petitioner.

Joseph B. Spillman, Asst. Atty Gen. (Douglas F. Gansler, Atty. Gen., of Maryland, of Baltimore), on brief, for respondents.

BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, LAWRENCE F. RODOWSKY (Retired, specially assigned) and ALAN M. WILNER (Retired, specially assigned), JJ.

BELL, C.J.

At issue in the instant appeal is the propriety of two rulings made by the Circuit Court for Garret County, the result of which was the entry of judgment in favor of Darren Gerald Kamp, the petitioner, and against the Garrett County Department of Social Services, Bureau of Support Enforcement, the respondent, appearing *ex rel.* Vicki Jo Duckworth (Ms. Duckworth).[1] The first ruling was the trial court's post divorce order that DNA paternity testing be conducted to determine whether the petitioner was the biological father of a child born during his marriage to Ms. Duckworth, his divorced spouse. The result of the DNA testing was the basis for the second challenged ruling, the trial court order that the petitioner's

---

1.  Although it arose in the context of an action to increase child support, the focus of this appeal is on the issue of paternity. More particularly, the question to be resolved is, when the child that is the subject of the inquiry is born during the marriage, but the issue of paternity was raised for the first time years after the parties divorced and at no time during the marriage or its immediate aftermath, under what circumstances is testing to determine paternity appropriate. The child's paternity necessarily was one of the issues the divorce court had to consider and it necessarily was also the subject of agreement between the petitioner and Ms. Duckworth during divorce and subsequent related proceedings. Nevertheless, it was the Bureau of Support Enforcement ("BOSE") that initiated the proceedings that resulted in the issue which prompted this appeal.

    The BOSE is a unit in the Department of Human Resources, Md. Code Ann., Human Serv. § 2–301(1)(2007). The Court of Special Appeals noted that, in proceedings below, counsel for the respondent told the trial court " '[I]t's a non-public assistance case' " and " 'There's no state funds being paid out in this case[.]' " *Dep't of Human Resources v. Kamp*, 180 Md.App. 166, 170 n. 1, 949 A.2d 43, 46 n. 1 (2008). In spite of that, the BOSE brought the action under Md.Code, (2006 Rep. Vol.) § 10–115 of the Family Law Article, which reads:
    "(b) *Initiation of legal proceeding*—In any support action in which the Administration is providing child support services under federal law, the Administration may initiate a legal proceeding to establish, modify, or enforce a duty of support."

child support obligation to the child the DNA testing determined he did not father be terminated. The respondent challenged these rulings in an appeal to the Court of Special Appeals, which, agreeing with the respondent, vacated the judgment on which the challenged rulings were based and remanded the case to the trial court for further proceedings. *Dep't of Human Resources v. Kamp*, 180 Md.App. 166, 949 A.2d 43 (2008). For reasons set forth below, we shall affirm the decision of the Court of Special Appeals.

## I.

The petitioner and Ms. Duckworth were married on September 13, 1983. The couple had three children whose paternity is neither questioned nor the subject of the proceedings *sub judice.* The child whose paternity is at issue in these proceedings, Julie Kamp, was conceived in the early half of 1992, when Ms. Duckworth became pregnant with a fourth child. This is significant because the petitioner had had a vasectomy performed in approximately June, 1987. Also, when Julie was conceived, the petitioner was employed out of state in Ravenswood, West Virginia. As a result, although the couple engaged in sexual relations when the petitioner was home, the petitioner was home only on an inconsistent basis.[2] Both the petitioner and Ms. Duckworth testified that both of them were aware, when Ms. Duckworth was found to be pregnant, that Julie was not, or possibly was not, the petitioner's biological child.

For her part, Ms. Duckworth had the following exchange with the petitioner's counsel:

"[MR. HANNA]: Following the conception of Julie, did you have any questions in your mind as to who the father was?

"[MS. DUCKWORTH]: No.

---

2. The parties agreed, as Ms. Duckworth testified, that the petitioner worked during the week and came home on the weekends or worked for two-weeks, and was off for a week, and that the petitioner spent his time off at home.

"[MR. HANNA]: Okay. Who was the father as far as you know?

"[MS. DUCKWORTH]: James Stanton.

"[MR. HANNA]: At the time you were having sexual relations though, were you not with Darren?

"[MS. DUCKWORTH]: No, not during the time I conceived. No. Darren and I were having marital problems and he was staying with a friend of his in West Virginia and had had sexual relations with another woman. That's what spawned all of this.

"[MR. HANNA]: Did the two of you have any discussions concerning paternity of Julie?

"[MS. DUCKWORTH]: Yes.

"[MR. HANNA]: And what was the nature of those discussions? The very next day after I had sexual relations with Jamie, I had called Darren and I had told him what had happened. And, we both know it's very easy for me to get pregnant. It always was. And he told me to wait a week or two and go get a pregnancy test done and we'll decide what to do from there. I waited a week or two, went and got a pregnancy test done, which, of course, came back positive."

Later, the petitioner testified at the hearing on the Motion to Modify Child Support and the Motion to Set Aside Paternity. He admitted, in an exchange with Donald Davis, counsel for the State, that he knew that he could not possibly be Julie's father:

"[MR. DAVIS]: Okay. And isn't it true that the time leading up to when she became pregnant, you were during one of those periods where you were out of town for a while. And that's why you would ask her to get the pregnancy test right away because you knew at that point you weren't the one who could have impregnated her at that point. Isn't that why you asked for the test?

"[MR. KAMP]: Yes."

According to Ms. Duckworth, both she and the petitioner discussed their options, including the possibility of abortion and adoption. Ms. Duckworth testified that family members, including her parents and her sisters, were involved in the discussion. While the petitioner was not certain, he conceded, as the colloquy with the Master reflects, that he was aware that James Stanton, with whom Ms. Duckworth admitted having an affair, could have been Julie's father.

> "[THE MASTER]: So you—were told Mr. Stanton was the father?
>
> "[MR. KAMP]: Well, we assumed because nobody did any other surgery, I guess. I didn't do anything as far as I checked to see if I was a hundred percent.[3]
>
> "[THE MASTER]: All right. But, what Ms. Duckworth talked about, you and her talked about the possibility of Mr. Stanton was the father?
>
> "[MR. KAMP]: Yes."

Ms. Duckworth, on the other hand, testified that she had no doubt of Julie's paternity, that Mr. Stanton was Julie's father. Before Julie was born on December 10, 1992, however, the couple decided to raise Julie as the petitioner's child.[4]

---

**3.** The petitioner testified that he was not positive that the vasectomy that he had in 1987 was effective and that he was sterile or unable to impregnate someone at the time that Julie was conceived. According to his testimony, the petitioner subsequently had his sperm count tested in 2002 or 2003 and the test revealed that he was sterile.

**4.** In a colloquy with his counsel, the petitioner confirmed this decision:
" '[[MR. HANNA]]: When did the issue of paternity—what did the two of you decide to do with regard to Julie's fatherhood, if you will?
" '[[MR. KAMP]]: We decided to raise her with the other kids.
" '[[MR. HANNA]]: And did you make any pact or agreement with regard to telling anyone else in the world as to whether or not there was a possibility that you may not be the father?
" '[[MR. KAMP]]: Did we ever make the agreement?
" '[[MR. HANNA]]: Right. What was your agreement?
" '[[MR. KAMP]]: Well, we never really made an agreement. We just assumed.
" '[[MR. HANNA]]: Assumed what?
" '[[MR. KAMP]]: That I wasn't the father.' "
*Kamp,* 180 Md.App. at 180–81, 949 A.2d at 52.

The couple separated in 1998 and were finally divorced in April of 1999. The Judgment of Divorce incorporated, but did not merge,[5] the terms of the Voluntary Separation Agreement that the petitioner and Ms. Duckworth agreed to and executed on December 15, 1998. According to that agreement, four children, including Julie, were born of the marriage. The Judgment of Divorce also listed the minor children of the parties. That list included Julie. The Judgment of Divorce, in addition, awarded custody of the four minor children to the parties jointly and ordered the petitioner to pay child support for each of them.

Julie lived primarily with Ms. Duckworth after the divorce, although she went to live with the petitioner, who had remarried, in June of 2001. After residing with the petitioner and his new wife at their home for approximately one year, Julie resumed living with Ms. Duckworth. During the summer of 2001, when she was eight years old, Julie learned that Mr. Stanton, and not the petitioner, was her biological father. It appears that Mr. Stanton's daughter informed Julie one day

---

5. The Separation Agreement of the parties read as follows:

"This Agreement was made in express consideration of the means of the respective parties and their station in life and shall be submitted to the Court in the event of a divorce proceeding either on an original Cross–Bill of Complaint to the end that the terms and provisions hereof may be incorporated in any Decree passed by the Court."

In *Johnston v. Johnston*, 297 Md. 48, 465 A.2d 436 (1983), this Court discussed separation agreements in the context of divorce decrees. The *Johnston* Court held that "where the parties intend a separation agreement to be incorporated but not merged in the divorce decree, the agreement remains a separate, enforceable contract and is not superseded by the decree." *Id.* at 58, 465 A.2d at 441. In the present case, however, the parties did not include a non-merger clause, but allowed for the possibility that the Circuit Court would incorporate the Separation Agreement in its judgment. The Circuit Court, in turn "[ordered] that the terms of the Voluntary Separation Agreement executed by the parties [were] . . . incorporated, but not merged, into the terms" of the divorce judgment. In such cases, where "the agreement does not include a non-merger clause and it is incorporated in the decree, the agreement is superseded by the decree." *Id.* at 56, 465 A.2d at 440; *See also Wallace v. Wallace*, 1 Hawaii Ct.App. 315, 619 P.2d 511, 513 (1980); *Bowman v. Bennett*, 250 N.W.2d 47, 50 (Iowa 1977). Therefore, the Separation Agreement in the case *sub judice* is superseded by the divorce decree.

that they were sisters, a fact that was later verified by Ms. Duckworth. Ms. Duckworth maintains that she provided confirmation only after speaking with the petitioner and obtaining his consent to tell Julie. The petitioner denies that he gave permission to Ms. Duckworth to tell Julie that he was not her biological father.

On January 11, 2002, Ms. Duckworth filed a petition in the Circuit Court for Garrett County asking the court to establish fixed visitation and child support. In her petition, Ms. Duckworth alleged that the petitioner "refused to develop a fixed schedule for visitation with the minor children" and that the petitioner's new wife had "acted in a manner to interfere in matters involving the children and has on several occasions refused to return one or more of the children with the acquiescence of the [petitioner]." Further Ms. Duckworth pleaded:

"The prior Judgment of this Court and the Agreement of the parties requires [petitioner] to pay child support; however, [petitioner] has failed, refused and/or neglected to pay child support in a consistent and reasonable manner, but rather makes unilateral reductions in the amount to be paid based upon what he perceives to be required by the Judgment and Agreement. [Ms. Duckworth] believes that the Court should establish child support in accordance with the Maryland Guidelines and require [petitioner] to pay the same pursuant to an Earnings Withholding Order."

In her amended petition, Ms. Duckworth requested that the court:

"a. Pass an Order establishing a fixed visitation schedule;

"b. Determine the arrearage in child support payments to be made by [petitioner];

"c. Enter a judgment in favor of [Ms. Duckworth] in the amount of any child support arrearage of [petitioner];

"d. Pass an Order establishing child support; .

"e. Pass an Order for Earnings Withholdings Order; ·and

"f.   Grant such other relief as the nature of her cause might require."

The petitioner answered the petition on February 27, 2002 and, in addition, filed a counter-petition to establish custody, visitation, and child support.   In his answer, the petitioner requested custody of the three children who remained minors, of whom Julie was one.[6]   The parties entered into a Memorandum of Understanding ("MOU") regarding the custody of the minor children on February 3, 2003.   In that Memorandum, which was incorporated by the Circuit Court on March 14, 2003, the parties agreed that:

"Four children were born as issue of their now dissolved marriage, of which two have reached the age of majority. There are two remaining minor children, to wit:   CASEY, born, February 12, 1998, now age fourteen (14);   and JULIE, born December 10, 1992, now age ten (10)."

The parties agreed that Ms. Duckworth would have sole legal custody of the two children and joint physical custody would be shared between the two parties.   The petitioner agreed to pay Ms. Duckworth child support in the amount of $100.00 per month.   Consistent with the MOU, the court ordered the petitioner to pay child support for Casey and Julie, the two children born "as issue of their now dissolved marriage," who remained minors.

On July 28, 2005, the respondent filed, on behalf of Ms. Duckworth, a motion to modify child support.   In that motion, the respondent proffered that "the Plaintiff/ Counter–Defendant, DARREN GERARD KAMP, has income with which he can pay an increased amount of child support."   The minor children for whose benefit the increase in support is sought are identified in the motion as Casey Kamp and Julie Kamp. Answering the motion, the petitioner made an assertion and a request:

---

**6.**   When the order was signed, the number of children who were minors had been reduced to two, as one of the children had reached majority.

"[T]he minor child, Julie Kamp, is not his biological daughter. Moreover, he has not adopted the said Julie Kamp, and requests this Honorable Court to order blood test for DNA testing for the purpose of establishing paternity of Julie Kamp. The issue of paternity was recently raised by the said Vicki Jo (Kamp) Duckworth when she began to indicate to Julie Kamp and to others that Darren G. Kamp was not, in fact, the biological father of Julie Kamp."

After a hearing, the presiding Master recommended that the petitioner's request for DNA testing be denied. The petitioner's exceptions to the Master's recommendations were sustained by the Circuit Court, which, after a hearing, ordered that the testing be done.

When DNA testing ordered by the court determined that the petitioner was not Julie's biological father, the petitioner filed a motion to terminate or stay payment of the child support attributable to her. The hearing master recommended that the petitioner's motion be disposed of as follows:

"The mother's request for an increase in child support is denied.

"The father's request to terminate support is granted.

"The father's child support obligation is terminated and any and all arrearage are deemed uncollectible."

The master reasoned, notwithstanding that the petitioner had always known, as the master found, that he was not Julie's biological father, yet had treated her as his daughter, the genetic test results rebutted the presumption that Mr. Kamp was Julie's father.

The respondent's exceptions to these recommendations were overruled by the Circuit Court. Accordingly, the Circuit Court adopted the Master's recommendations; it denied the motion to modify child support, granted the petitioner's motion to terminate both his child support and his child support obligation and deemed all arrearages uncollectible. The respondent timely noted an appeal to the Court of Special Appeals. As we have seen, that court vacated the judgment

entered by the trial court and remanded the case for further proceedings.

## II.

We first must consider whether, where the petitioner had not previously challenged the paternity of the child at issue, either during the marriage or during the divorce and post divorce proceedings, the Court of Special Appeals correctly determined that the trial court erred when it granted the petitioner's request for DNA paternity testing. As we have seen, the child was born during the petitioner's marriage to her mother and, therefore, her paternity could have been, but was not, raised either during the marriage or during subsequent divorce proceedings. We hold that the intermediate appellate court ruled correctly.

Determining the propriety of the decision by the intermediate appellate court begins with the Maryland statutes addressing and, therefore, governing, paternity. They are found in the Estates and Trusts Article and in the Family Law Article and represent two viable methods or proceedings for establishing paternity. *Taxiera v. Malkus*, 320 Md. 471, 478–79, 578 A.2d 761, 764 (1990); *Turner v. Whisted*, 327 Md. 106, 112, 607 A.2d 935, 938 (1992)("[T]he legislature offered a choice of actions by which one could seek to establish paternity.").

Maryland Code (1974, 2001Repl.Vol.) § 1–206(a) of the Estates and Trusts Article teaches, concerning the legitimacy of a child, that "a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents." [7] Maryland Code (1984, 2006 Repl.Vol.) § 5–

---

7. Excepted from this presumption were adopted children, pursuant to the rule stated in Maryland Code (1974, 2001 Repl. Vol) § 1–207 of the Estates and Trusts Article, which, in pertinent part, provides:

"(a) General rule.—An adopted child shall be treated as a natural child of his adopting parent or parents. On adoption, a child no longer shall be considered a child of either natural parent, except that

1027(c)(1) of the Family Law Article confirms that there is such a presumption and provides a more precise statement of the nature of that presumption. It states, "there is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."

This is in contrast to a child born to parents who have not participated in a marriage ceremony. Such a child, Estates and Trusts § 1–208 advises, is "considered to be the child of the mother," in section (a), and is considered, in section (b) to be the child of the father, only when the father:

"(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;

"(2) Has acknowledged himself, in writing, to be the father;

"(3) Has openly and notoriously recognized the child to be his child; or

"(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father."

When the child is "born out of wedlock," *see* Family Law § 5–1002(b),[8] the applicable provisions are those found in §§ 5–1001–5–1048 of the Family Law Article. Of some significance to this case is § 5–1029. Captioned, "Blood or genetic tests," it provides:

---

upon adoption by the spouse of a natural parent, the child shall still be considered the child of the natural parent."

**8.** Stating the legislative policy underlying Subtitle 10, Paternity Proceedings, § 5–1002(b) makes unmistakable its intention to benefit "children born out of wedlock":

"(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

"(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

"(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock."

"(b) In general.—On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child."

This Court has construed this section to mean that a trial judge has no discretion to deny a blood or genetic test request.[9] *Langston v. Riffe,* 359 Md. 396, 429, 754 A.2d 389, 407 (2000)("To now require a trial court to conduct a best interests analysis prior to granting a blood or genetic test would counter the original and long-standing legislative intent of this statute.") *See Evans v. Wilson,* 382 Md. 614, 626, 856 A.2d 679, 686 (2004). On the contrary, we held:

"the provisions of section 5–1029 are mandatory once a party to any paternity proceeding moves for a blood or genetic test. This includes a post-declaration proceeding, subsequent to the initial declaration of paternity, conducted under section 5–1038(a)(2)(i)2, challenging the declaration because the putative father is not, or may not be, the biological father. Given the mandatory statutory language of section 5–1029, and the history of that section, the 'best interests' analysis generally may not be conducted in determining whether to grant a motion for testing."

*Langston,* 359 Md. at 435, 754 A.2d at 410. Also of interest and relevant to the case *sub judice,* are §§ 5–1027 and 5–1038(a)(2)(i)(2). The former, in addition to confirming the

---

**9.** Not all courts agree. For example, where "there was some evidence . . . that [the presumptive father] knew that the two boys were not biologically his much earlier [and] . . signed an agreed order in 1996, admitting that he was the father of the children," the Supreme Court of Arkansas held that the principle of res judicata applied and reversed the chancery court for failing to so order. *State Office of Child Support Enforcement v. Williams,* 338 Ark. 347, 995 S.W.2d 338, 340–41 (1999). *See In re Paternity of Cheryl,* 434 Mass. 23, 746 N.E.2d 488, 490 (2001), declining "to hold that, whenever a father establishes that he is not the child's biological parent, relief from the obligations of paternity is automatically available." Indeed, *Williams* cited *Godin v. Godin,* 168 Vt. 514, 725 A.2d 904 (1998) as standing for the proposition that the doctrine of res judicata applies to the issue of paternity when paternity has been established under a divorce decree.

presumption of paternity and categorizing it as rebuttable, § (c)(1), prescribes one method for rebutting it. Section (c)(2). Section 5–1038(a)(2)(i)(2) prescribes another: "if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order." [10]

As we have seen, the presumption of paternity is applicable to paternity proceedings under both the Estates and Trusts Article and the Family Law Article. If, as § 5–1038 recognizes, the result of blood or genetic testing is ground for modifying an enrolled judgment of paternity, it follows that the result of such testing is evidence that rebuts the statutory presumption of paternity.[11] *See Turner*, 327 Md. at 110–11,

---

**10.** Section 5–1038(a)(2)(ii) prohibits a declaration of paternity from being modified or set aside "if the individual named in the order acknowledged paternity knowing he was not the father." This is another potential basis for rejecting the petitioner's argument that his support obligation should be terminated.

**11.** Associate Professor Theresa Glennon has analyzed the role that marital presumptions play in a court's decision to order genetic testing. In her article, *Somebody's Child: Evaluating the Erosion of the Marital Presumption of Paternity*, 102 W.Va. L.Rev. 547, 568 (Spring 2000), she observes, in part:

"The circumstances in which the marital presumption of paternity can be successfully rebutted varies dramatically from state by state and by factors such as the identity of the party who brings the action, the timing of the action, the marital status of the mother and the presumed father, and the specific promises made or actions taken by the presumed father or alleged unmarried biological father. Courts with similar statutes have reached dramatically different conclusions about the circumstances in which rebuttal of the marital presumption of paternity is appropriate.

"Central to these differences is the question of the role of genetic testing. In most states, scientific evidence of paternity creates a presumption of paternity. In some states scientific evidence of paternity creates a conclusive presumption. In those states that do not treat the results of genetic testing as a conclusive presumption, courts must determine whether the results of the genetic testing are, by themselves, sufficient to rebut the marital presumption or if other factors, such as equitable estoppel or the best interests of the child, prevent the rebuttal of the marital presumption. These judicial decisions concerning whether genetic test results are sufficient to rebut the marital presumption of paternity appear to be based on assumptions about fatherhood."

607 A.2d at 937, in which this Court, rejecting the determination by the Court of Special Appeals that the putative father in that case " 'may not initially use the blood test provisions of the paternity statute to overcome the presumption of legitimacy of the child herein,' " recognized this to be so.[12] *See also Evans,* 382 Md. at 629, 856 A.2d at 688, emphasizing that *Turner* made clear that, under Estates and Trusts § 1–206, "a blood or genetic test may be ordered only upon a showing of good cause presumably of sufficient persuasive force to overcome the statutory presumption."

In proceedings brought under the Family Law Article, as we have seen, *see infra* at § 5–1029, it has been held that the request for blood or genetic testing requires that the blood or genetic testing be ordered, and that there is no discretion to deny the request. On the other hand, no such mechanistic response has been required when the request is made during proceedings, brought under the Estates and Trusts Article, to resolve the paternity dispute between "two men each acknowledg[ing] paternity of the same child." *Turner,* 327 Md. at 113, 607 A.2d at 938. Indeed, as we explained in *Turner,* it was the need to exercise discretion that militated in favor of proceedings under that Article:

> "As advanced by this Court in *Thomas* and *Dawson,* the Estates & Trusts Article presents the 'more satisfactory' and 'less traumatic' means of establishing paternity. *Thom-*

(footnotes omitted).

**12.** In *Mattingly v. Shifflett,* 327 Md. 337, 609 A.2d 329 (1992), the issue with which this Court was presented was the proper procedure for rebutting the presumption of legitimacy prescribed by the predecessor to § 5–1027(c), § 5–1028(c). Although the trial judge in that case ruled that blood tests ordered pursuant to § 5-1029(a) could be used to rebut the presumption of paternity, thus resolving the procedural question, the case reached us without a final judgment. We dismissed the appeal on that basis. When a similar issue was before the Court in *Monroe v. Monroe,* 329 Md. 758, 765, 621 A.2d 898, 901 (1993), we noted that "*Shifflett* is not … of any precedential value." Nevertheless, we declared that the trial court in our case erred when it "did not consider, when ordering the blood tests in connection with the custody dispute, whether to do so was in the child's best interest" and admitted the results into evidence over objection. *Id.* at 773, 621 A.2d at 905.

*as [v. Solis]*, 263 Md. [536], 544, 283 A.2d [777], 781 [(1971)]; *Dawson [v. Eversberg]*, 257 Md. [308], 314, 262 A.2d [729], 732 [(1970)]. In Turner's attempt to establish paternity under the Estates & Trusts Article, he had to rebut the presumption that Jeffrey was the legitimate child of Kelly and Danny Whisted.... A motion for blood tests made under the Estates & Trusts Article is best analyzed as a request for a physical examination under Maryland Rule 2–423,[13] and the court has discretion to grant or deny the blood tests."

*Id.* at 113, 607 A.2d at 938–39. (Citing Estates & Trusts § 1–206, footnote omitted). After discussing *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91, *reh'g denied,* 492 U.S. 937, 110 S.Ct. 22, 106 L.Ed.2d 634 (1989), in which both the majority and the dissent identified different and competing interests, we opined:

"We believe that a trial court ought to be able to consider and balance the different interests that were separately recognized by the majority and the dissent in *Michael H.* A discovery request for blood tests allows the court to weigh these competing interests. Most significantly, the determination of good cause allows the court discretion to consider the best interests of the child. *Matter of Marriage of Ross*, 245 Kan. 591, 783 P.2d 331, 338 (1989) ('Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child....'); *McDaniels v. Carlson*, 108

---

13.  Then, as now, Rule 2–423 provided:

"When the mental or physical condition or characteristic of a party in the custody or under the legal control of a party is in controversy, the court may order the party to submit to a mental or physical examination by a suitably licensed or certified examiner or to produce for examination the person in the custody or under the legal control of the party. The order may be entered only on motion for good cause shown and upon notice to the person to be examined and to all parties. It shall specify the time and place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. The order may regulate the filing and distribution of a report of findings and conclusions and the testimony at trial by the examiner, the payment of expenses, and any other relevant matters."

Wash.2d 299, 738 P.2d 254, 261 (1987) (where child is presumed legitimate, best interests of the child should be considered before ordering blood tests)."

*Turner*, 327 Md. at 116, 607 A.2d at 940.

Among the competing interests, toward the balancing of which the exercise of discretion was to be directed, we identified was "the court's paramount concern of protecting [the child's] best interests," *id.* at 117, 607 A.2d at 940, along with non-exclusive criteria for its determination:

"consideration of the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. . . . Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history."

*Id.* at 116–17, 607 A.2d at 940, citing *Ross*, 245 Kan. at 602, 783 P.2d at 338; *McDaniels*, 108 Wash.2d at 312–13, 738 P.2d at 262. *See C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365, 372 (1990)(requiring a preliminary showing of a substantial parent-child relationship between the putative father and the child). The other competing interests we identified and which we directed to be considered on remand were the putative father's commitment to the responsibilities of parenthood and interest in establishing his status as the child's natural father, balanced against "the Whisteds' interest in protecting the integrity of the familial relationships already formed." *Turner*, 327 Md. at 117, 607 A.2d at 940.[14]

Using the identical analysis, in *Evans v. Wilson*, 382 Md. 614, 856 A.2d 679 (2004), we reached the identical result on the threshold issue. There, as in *Turner*, two men, one of whom was the husband of the mother when the child was born, and thus the presumptive father, claimed paternity. The putative

---

**14.** This Court refined the test for good cause in *Monroe v. Monroe*, 329 Md. 758, 767, 621 A.2d 898, 902 (1993), noting that "assessment [of good cause] may only be made by considering the entirety of the relationship between the child, the [mother] and [Mr. Monroe]."

father made a motion for an order for blood test in order to establish his paternity. We held that, prerequisite to ordering a blood or genetic test, the trial court should be satisfied that good cause for the testing has been shown, that "blood or genetic testing would be in the best interests of [the child]." *Id.* at 629, 856 A.2d 679, 856 A.2d at 688. Further expounding on the "best interests" point, we said:

"Moreover, considering the 'best interests" standard represents the best policy for evaluating when a child born during a marriage can be ordered to undergo paternity testing. If the mandatory blood or genetic testing under Section 5–1029 could be invoked every time an individual seeks to establish paternity of a child born during a marriage, the consequences to intact families could be devastating. Without regard to the child's best interests, courts would be forced to order genetic tests of every child whose paternity is merely questioned. This would be the case even if the child is well cared for and could assert that he or she does not want his or her life to be disturbed. We do not believe that, in enacting the 'Paternity Proceedings' of the Family Law Article, the legislature intended such an effect."

*Id.* at 636, 856 A.2d at 692.

That was not the end of our inquiry in *Evans,* however. The trial judge in that case recognized her obligation to assess the putative father's request for testing from the perspective of the child's best interest, and, finding his showing in that regard to be deficient, denied it. Thus, we were required to review that determination for abuse of discretion. *Id.* at 637, 856 A.2d at 693 (and cases therein cited). In concluding that there was no abuse of discretion, we were satisfied that the trial judge followed the guidance provided by *Turner,* 327 Md. at 116–117, 607 A.2d at 940, noting that, in rendering her opinion, she:

"emphasized that her primary concerns were [the child's] best interests. Invoking *Turner,* she recognized that preserving the family unit was 'crucial' to [the child's] interests and that it outweighed Evans' interest in establishing his status as [the child's] father. Judge Holland acknowledged

that Evans' relationship with [the mother] created some 'suspicion' that he was the father. The judge refused, however, to 'destroy a family unit based on suspicion,' especially given what was, in the judge's estimation, an insufficient connection between Evans and [the child]."

*Evans,* 382 Md. at 637, 856 A.2d at 693.

Although it was the mother who sought to disestablish paternity in that case, the discussion of "best interest" and "good cause" in *Monroe v. Monroe,* 329 Md. 758, 621 A.2d 898 (1993) is instructive. There, during a custody case battle over a child born out of wedlock, mother moved for blood testing of the man who acknowledged the child as his own, both before and after they were married, and maintained a fatherly relationship with the child, solely for the purpose of disestablishing his paternity and thus his right to custody. *Id.* at 766, 621 A.2d at 902. Although we recognized that the mother was entitled to request that paternity blood testing be done, we concluded that consideration of her request was to be made pursuant to Maryland Rule 2–423, which, as a threshold determination, requires a showing of good cause. *Id.* at 767, 621 A.2d at 902. Whether "good cause" had been shown, in turn, was to be assessed in *light* of the "best interest" of the child, we added. *Id.* (citation omitted).

Aware of the reason that the mother was requesting the blood test,[15] *id.,* and the policies and purposes underlying the paternity statute and Estates & Trusts § 1–208—the legitimation of children born out of wedlock and securing them "as

---

15. As to this point, we pointed out:

"From the motion, and the accompanying affidavit, clearly, the only basis for requesting blood tests is the petitioner's desire to prove that the respondent is not Beth's biological father. Indeed, her motion for blood tests is explicit in that regard. From the motion and affidavits it may also be inferred that the petitioner *now* believes that Beth's best interest lies in her being in the petitioner's sole custody, which requires the termination of the relationship, as it has developed, between the child and the respondent. As noted earlier, she neither offers, nor intends, to establish substitute paternity. Rather, she intends only that her paramour will adopt Beth."

*Monroe,* 329 Md. at 770–71, 621 A.2d at 904.

nearly as practicable, the same rights to support, care and education as children born in wedlock"—*id.*, we proceeded on the premise that, while not directly implicated in a custody dispute, those policies and purposes were "nevertheless . . . relevant to the determination whether good cause for ordering the blood test ha[d] been shown." *Id.* Accordingly, we observed:

> "To justify ordering blood tests, at the behest of the mother, under circumstances in which the only effect of results favorable to the mother would be to show that a man who has acted as the child's father, who the child regards as her father, who has acknowledged the child, and who is married to the child's mother is, in fact, not the child's father requires a showing by the mother that to do so is in the best interest of the child. *In the Matter of the Marriage of Ross,* 245 Kan. 591, 783 P.2d 331, 338 (1989)('Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child, including physical, mental, and emotional needs.'); *In the Matter of the Marriage of Zodrow,* 240 Kan. 65, 727 P.2d 435, 440 (1986) (same); *Ban v. Quigley,* 168 Ariz. 196, 812 P.2d 1014, 1017 (App. 1990)(Strong public policy of preserving the family unit requires consideration of best interest of the child before or during blood tests at the behest of putative father when neither mother nor presumptive father questions the latter's paternity.). *See also Sandy M. v. Timothy J.,* 138 Misc.2d 338, 524 N.Y.S.2d 639, 642–43 (Fam.Ct.1988); *Boyles v. Boyles,* 95 A.D.2d 95, 466 N.Y.S.2d 762, 765 (3 Dept.1983). This is especially so when, as here, one means of legitimation was the parties' marriage, after which they held the child out as being *their* legitimate issue. *Boyles,* 466 N.Y.S.2d at 765."

*Id.* at 771, 621 A.2d at 904.

Finally, the fact that there was no identity of relationship between the parties with *Turner* and *Evans* was not a basis for conducting a different weighing analysis. Indeed, we opined that the same factors identified in *Turner* applied with

equal force to the analysis to be conducted in that case. *Monroe*, 329 Md. at 772–73, 621 A.2d at 905. That is as it should be, for though the factual circumstances surrounding the issue may change or be different, the issue itself, the best interest of the child does not. It simply must be analyzed and resolved in the context of the facts giving rise to it.

This case is, to be sure, different from both *Turner* and *Evans*. In both those cases, two men were vying for paternity; the question presented in each was designed to determine which, of two men, was the father. In present case, the man who is the presumed father of the child, who also has acknowledged the child as his own not simply during the marriage, but for over six years after the parties divorced, is the one seeking to rebut the presumption that he is the father and, thereby, to renounce, to rescind, his acknowledgment of paternity. On these facts, the case for conditioning the ordering of a blood test on a finding of good cause, tied to and determined by the best interest of the child, is, at least as, if not more, compelling than it was in *Turner* and *Evans*. That is the position this Court took in *Monroe*, a case with which the case *sub judice* shares similarities. It certainly appears to be the position taken by the Court of Special Appeals in this case. *See Kamp*, 180 Md.App. at 198, 949 A.2d at 62. That position is likewise evident in the intermediate appellate court's decision in *Ashley v. Mattingly*, 176 Md.App. 38, 62, 932 A.2d 757, 772 (2007).

Courts from other jurisdictions that have considered the issue agree. *Baker v. Baker*, 276 Ga. 778, 778, 582 S.E.2d 102, 102 (Ga.2003)(holding that the " 'best interests of the child' " standard applies "where a biological mother has essentially sought to delegitimize her child and prevent the legal and presumptive father from asserting any of the rights associated with parenthood in conjunction with the couple's divorce action."); *In re Marriage/Children of Betty L.W. v. William E. W.*, 212 W.Va. 1, 10, 569 S.E.2d 77, 86 (W.Va.2002)("a reviewing court must examine the issue of whether an 'individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that

disproof of paternity would result in undeniable harm to the child.' ") (citation omitted); *Culhane v. Michels,* 615 N.W.2d 580, 589 (S.D.2000)(requiring that "compelling enough reasons to disrupt the life of a child born during their marriage" be shown as a predicate to paternity testing, the court declared, "Belated efforts to declare a child illegitimate, for whatever reasons, should seldom prevail."); *Godin v. Godin,* 168 Vt. 514, 725 A.2d 904, 910 (1998)(emphasizing the State's "strong and direct interest in ensuring children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern of a child's biological origins," and the finality of a paternity declaration in a divorce judgment "absent clear and convincing evidence that it serves the best interests of the child.").[16] *See also* Jana Singer, "Marriage, Biology, and Paternity: the Case for Revitalizing the Marital Presumption," 65 MD. L. REV. 246, 264 (2006) (collecting and discussing cases that have applied the best interests standard in considering requests for genetic testing).

The petitioner and Ms. Duckworth were married at the Allegany County Courthouse in 1983. Julie was born on December 10, 1992. Because the couple was not divorced until April 9, 1999, there can be no question that, pursuant to Estates and Trusts § 1–206(a), Julie is presumed to be the child of both the petitioner and Ms. Duckworth.

---

**16.** Both Vermont and South Dakota had statutes which, like Maryland's Estates and Trusts § 1–206, create a rebuttable presumption that a child born during the marriage is the child of both the husband and the wife. The current Vermont Statute, 15 Vt. Stat. Ann. § 308(4)(2009), which is the same, if not, identical to the statute in effect at the time *Godin* was decided, provides:

"A person alleged to be a parent shall be rebuttably presumed to be the natural parent of a child if:
(4) the child is born while the husband and wife are legally married to each other."

Likewise, the current South Dakota statute, S.D. Codified Laws § 25–5–3, provides:

"The husband and wife are presumed to be the parents of any child born to the wife during the marriage or within ten months after the dissolution of the marriage."

In his answer to the respondent's motion to modify child support, despite his prior acknowledgment of parentage, after Julie's birth, during the marriage, during the divorce proceedings and during a prior post divorce hearings on custody visitation and support, the petitioner denied that he was the Julie's father and requested a DNA paternity test to confirm that denial, and, thereby rebut the presumption that he was Julie's father. When the master recommended denial of the petitioner's request for DNA testing, the petitioner filed exceptions. In those exceptions, the petitioner stated:

"5. That in its evaluation of whether or not to grant the requested blood or genetic testing, the Master disregarded the existing Maryland Law. The cases indicated that in making the determination which was at issue in this case, the Court should consider the interests of the family unit, the interests of the parties seeking the request, and the best interests of the child. The Master did not comment on these factors in making his decision. Therefore, it is the opinion of the excepting party that the Master did not base his Recommendations on Maryland Law.

"6. Moreover, no reason was advanced by the said Vicki Duckworth, or the State, as to why continuing to charge Darren Kamp with child support would be in the best interests of any family unit, Darren Kamp, or the minor child.

"7. That no reason was advanced to show why collecting child support from Darren Kamp, rather than from the true father of the child, would be in the child's best interests. This is especially true in light of the fact that subsequent to the divorce of the parties, the mother of the minor child unilaterally took it upon herself to declare to the child that Darren Kamp was not her father."

In the present case, the trial judge did not issue an opinion explaining his reasons for issuing the order requiring the petitioner, Ms. Duckworth and Julie to undergo genetic testing. The trial judge simply granted the petitioner's exceptions. In a later opinion, terminating the petitioner's child support obligation, however, the trial judge noted:

"In its decision to order the DNA testing, the court considered the various factors involved. The parties were separated and the truth about Julie's parentage was out. There was no family unit to protect. In this instance, there was no reason not to obtain indisputable medical evidence to confirm the truth about Mr. Kamp's relation to Julie."

*Kamp,* 180 Md.App. at 188, 949 A.2d at 56. He also acknowledged and deferred to the master's extensive knowledge of this case, the parties, and the children involved, commenting:

"It is also clear that he considered the interests of Julie in making his decision. The truth about her parentage was already well known. There was no testimony to indicate that Ms. Duckworth could not get child support from Mr. Stanton. The Master clearly took these things into consideration while properly applying Maryland law when making his recommendations."

*Id.* at 189, 949 A.2d at 56.

The Court of Special Appeals did not agree that ordering the DNA test served Julie's best interests. It reversed:

"[T]he case *sub judice* does not contain any evidence to show that a paternity test was in Julie's best interest. Julie was approximately thirteen years of age by the time the genetic test was ordered. DSS offered evidence that Julie might suffer emotional harm if such a test were ordered at that point. Julie's therapist, Ms. Barnard, testified that Julie did not want a paternal relationship with Stanton. Moreover, Ms. Duckworth claimed that '[i]t would be detrimental' to Julie for [the petitioner] to undergo a genetic testing to prove he is not Julie's biological father, because Ms. Duckworth has attempted to make 'very clear' to Julie that paternity is not 'a blood issue' and [the petitioner] 'is now making it a blood issue.' "

*Id.* at 200, 949 A.2d at 63.

We agree with the Court of Special Appeals. To be sure, the trial court considered some factors relevant to a consideration of best interest, namely, that the parties were separated and that Julie knew that the petitioner was not her biological

father, "the truth about Julie's parentage was out," from which it concluded that "there was no family unit to protect." It is clear, however, that the court either did not consider, or gave short shrift to, other important factors bearing on Julie's best interests. The father-daughter relationship existing between Julie and the petitioner was neither a recently developed one nor one lacking in complexity. It has existed, at minimum, some 13 years, and without any legal challenge or hint of challenge, from Julie's birth in 1992 to 2005, when the petitioner, in court pleadings, withdrew his long-standing acknowledgment. For eight of the years that the relationship existed, Julie had no knowledge of any controversy concerning her parentage. That was true despite the circumstances surrounding her conception, which rendered the petitioner's parentage ambiguous, to say the least. Whether, or not, the petitioner knew he was not Julie's father, he agreed to, and, in fact, did, raise her as his child. Indeed, the father-daughter relationship was developed and maintained throughout the parties' marriage and it continued even after the parties separated and were divorced. As we have seen, the petitioner entered into a Voluntary Separation Agreement with Julie's mother, in which he represented that Julie was one of the four children born of the marriage. That separation agreement was incorporated, although not merged, in the Judgment of Divorce, and, thereby the representation of paternity therein contained was made to the court. Based on that agreement, the Judgment awarded joint custody of the parties' minor children to the petitioner and Ms. Duckworth and ordered the petitioner to pay child support for each. Although Julie lived primarily with her mother after the parties separated and divorced, she did live for a time, approximately one year, with the petitioner and his new wife.

It is undisputed that Julie was told that the petitioner may not be her father, that the person who probably was her father was identified, that the initial source of the information was a girl who believed Julie to be her sister and that the petitioner's non-paternity was confirmed by Ms. Duckworth. What is disputed is whether the confirmation was authorized

by the petitioner. In any event, subsequent to that disclosure, the petitioner continued to acknowledge Julie and, in fact, in a counter-petition to Ms. Duckworth's petition to establish custody, visitation and child support, the petitioner sought custody of Julie. By subsequently entering into a Memorandum of Understanding, the petitioner settled for joint physical custody. He agreed to pay, as ordered by the court order, child support for Julie. It was more than two years later that the petitioner raised the paternity issue as a defense. That was approximately four years after Julie was told that he was not her father.

Looking at what the trial court said in justification of the DNA testing order, it is, we believe, fair to assume that it believed the critical inquiry into best interest could be distilled to whether Julie was aware of her parentage [17] and whether there was a family unit to protect. That assumption is confirmed by what the trial court said immediately after making these points: "Whenever the status of the law is such that there is little or no interest in the truth, then there is something wrong with the system or the law." *Kamp*, 180 Md.App. at 189, 949 A.2d at 56. As the factual recitation just concluded evidences, the inquiry is not so simple and certainly not so cut and dried. In addition to the length and complexity of the relationship between the petitioner, Julie and Ms. Duckworth and its interrelationship to the family unit and the other members in that unit, which certainly have to be considered, Ms. Duckworth offered evidence of the effect, emotionally, that DNA testing might have on Julie and with regard to how she viewed a parental relationship with another "father." The trial court's narrow focus does not suffice to ensure the best interest of this child. To be sure, the trial court did reference the master's report, which "clearly identified some of the effects these proceedings have had on Julie, *Kamp*, 180 Md.App. at 189, 949 A.2d at 56–57; however, it did not

---

17. There was a dispute among the parties as to whether the disclosure was unilateral by Ms. Duckworth, suggesting an inappropriate motive, or confirmed by the petitioner. The trial court does not resolve the conflict, which does not appear to be relevant to its calculus.

thereby broaden its focus. Instead, reiterating and accepting that "Julie already knew that Mr. Kamp was not her biological father," it assumed and stated emphatically that "[a]ny emotional damage resulting from that knowledge cannot be attributed to a Master's hearing or recommendation some five years after the fact." *Id.* at 189, 949 A.2d at 57. As we pointed out in *Monroe*, 329 Md. at 767, 621 A.2d at 902, "Th[e] assessment [of whether DNA testing is in the child's best interest] may only be made by considering the entirety of the relationship between the child, the petitioner and the respondent." Knowledge of parentage alone or in combination with the divorce of the child's parents is not the entirety of the relationship between the child, her mother and her presumed father.

In any event, what the Supreme Court of South Dakota said when addressing a similar issue has particular relevance to this case:

> "Belated efforts to declare a child illegitimate, for whatever reasons, should seldom prevail. [The presumptive father] has failed to show sufficient cause for paternity testing at this late juncture. The welfare of the child must be considered over the father's long delayed challenge to the child's parentage. [The presumptive father] has treated both children as his own since birth. He claims that his request is not made to recover past child support, but merely to find out if he is the father and whether [the children's mother] perpetuated a fraud upon him. These are not compelling enough reasons to disrupt the life of a child born during their marriage." (footnotes and citations omitted).

*Culhane v. Michels,* 615 N.W.2d at 589.

In this case, the petitioner has treated Julie as his own since her birth. Moreover, his only claim is that "no reason was advanced to show why collecting child support from [the petitioner], rather than the true father of the child, would be in the child's best interest [, especially since,] subsequent to the divorce of the parties, the mother of the minor child unilaterally took it upon herself to declare to the child that [the petitioner] was not her father."

The reasons offered by the trial court being insufficient cause, in the interests of the child, to order DNA testing, the trial court abused its discretion in that regard. Moreover, like the Court of Special Appeals, *Kamp*, 180 Md.App. at 198, 949 A.2d at 62, and contrary to the express finding of the trial court, we are not at all sure that the trial court applied the correct test in ordering DNA testing. And, because, unlike *Monroe*, essentially a custody case in which paternity was being used as a sword to defeat the self-acknowledged father's claim to custody, the meaning and vitality of the long-standing, well-recognized presumption of legitimacy and fatherhood are at stake. Accordingly, unlike *Monroe*, we agree with the intermediate appellate court that a remand for further proceedings in light of the principles we have here reiterated is required. Although it is true that "the cat is now out of the bag and cannot now be stuffed back in," *Monroe*, 329 Md. at 773, 621 A.2d at 905, nevertheless, the DNA test results need not be and, we hold, shall not be considered until doing so is determined to be in the child's best interests. *See Matter of the Marriage of Ross*, 245 Kan. at 602, 783 P.2d at 338.

## III.

The respondent argues alternatively, and in any event, that the petitioner is barred from denying his obligation to pay child support. Its premise, accepted by the Court of Special Appeals, is that, despite relieving the petitioner of his support obligation, the trial court did not disturb the petitioner's parental rights, 180 Md.App. at 201–02, 949 A.2d at 64, and is based on the theories of judicial and equitable estoppel, among others. To support those theories, it relies on many of the factors we have already identified as informing the determination of the best interest of the child, most particularly the length of the time that the father-daughter relationship has continued, its continuation despite the breakup of the marriage of the petitioner to Ms. Duckworth and the representations the petitioner made to the court, via the Separation Agreement entered into during the divorce proceedings and

the Memorandum of Understanding, which resolved a custody and support dispute.

This Court most recently defined judicial estoppel in *Dashiell v. Meeks*, 396 Md. 149, 913 A.2d 10 (2006). There, we instructed, to assert a claim of judicial estoppel, a party must show that three circumstances exist: "(1) one of the parties takes a factual position that is inconsistent with a position it took in previous litigation, (2) the previous inconsistent position was accepted by a court, and (3) the party who is maintaining the inconsistent position must have intentionally misled the court in order to gain an unfair advantage." *Id.* at 171, 913 A.2d at 22 (citing *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 464, 910 A.2d 1072, 1087 (2006))(citing *Pittman v. Atlantic Realty Co.*, 359 Md. 513, 529 n. 9, 754 A.2d 1030, 1038–39 n. 9 (2000)). Judicial estoppel is applicable, we declared, "when it becomes necessary to protect the integrity of the judicial system from one party who is attempting to gain an unfair advantage over another party by manipulating the court system." *Id.* at 171, 913 A.2d 10, 913 A.2d at 23.

Equitable estoppel, a doctrine related to judicial estoppel, also would bar the petitioner from terminating his child support obligation, the respondent posits. Equitable estoppel was defined by this Court in *Knill v. Knill*, 306 Md. 527, 510 A.2d 546 (1986):

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

3 J. Pomeroy, *Equity Jurisprudence*, § 804 (5th ed.1941), *quoted in Leonard v. Sav–A–Stop Services*, 289 Md. 204, 211, 424 A.2d 336, 339 (1981).

"Thus, equitable estoppel requires that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped." (citations omitted).

*Id.* at 534, 510 A.2d at 549.

The *Knill* court defined "equitable estoppel as being comprised of three basic elements: " 'voluntary conduct' or representation, reliance, and detriment," *id.* at 535, 510 A.2d at 550, and it said that the "elements are necessarily related to each other." *Id.* In *Knill,* the couple had been married for ten years and had two children when Stephen, the child in question, was born. Like the petitioner in this case, the husband had undergone a vasectomy-one and one-half years earlier-prior to Stephen's conception. The Knills decided to move past the wife's infidelity and continue their marriage. Thus, Stephen was raised as if he were Mr. Knill's biological child. The Knills remained married for an additional twelve years before Mrs. Knill revealed to Stephen, as a result of a family argument, that Mr. Knill was not his father. Mr. Knill confirmed that fact to Stephen, but continued to support him until two years later, in 1984, when Mrs. Knill sued for divorce and requested child support for Stephen. At that time, unlike in the present case, where the petitioner waited six years after the couple's divorce and four years after the disclosure that the petitioner was not her father to dispute Julie's paternity, Mr. Knill denied that Stephen was his natural child. According to the record, the Knills knew who Stephen's biological father was. In fact, the evidence at trial suggested that the natural father was "at all times available for process and financially able to support Stephen." *Id.* at 530, 510 A.2d at 547. There was also no evidence presented that Mr. Knill discouraged Mrs. Knill from seeking support from Stephen's biological father. The Circuit Court found that Mr. Knill was equitably estopped from denying his obligation to support Stephen financially and Mr. Knill appealed to the Court of Special Appeals. *Id.* This Court issued a writ of certiorari prior to argument in that court.

Although we were satisfied that two of the required elements, representation and reliance, were present in the case, *Knill v. Knill*, 306 Md. at 536–37, 510 A.2d at 551, we concluded that equitable estoppel was not an available remedy. *Id.* at 539, 510 A.2d at 552. The Court explained:

"The evidence in this case, however, fails to demonstrate any financial detriment incurred by Stephen [18] as a result of [Mr. Knill's] course of conduct during their twelve-year relationship. Indeed, if any detriment was incurred by Stephen, it was emotional and attributable to his mother. It was she who ripped the "cloak of legitimacy" off the boy following a family dispute, when she revealed to him that [Mr. Knill] was not his father, a fact she had not concealed from the rest of the family. [Mr. Knill's] attempt to console Stephen demonstrates his concern for Stephen's emotional well-being."

*Id.* at 537, 510 A.2d at 551.

The Court of Special Appeals held in present case that the error committed in ordering DNA testing tainted the trial court's ruling terminating the petitioner's child support obligation based on those test results. Nevertheless, it went further, opining that the same conclusion would obtain "even if the circuit court had properly ordered the genetic test." 180 Md.App. at 200, 949 A.2d at 63. In reaching that conclusion, the intermediate appellate court was persuaded that, when the trial court did not terminate the petitioner's paternity, it left intact his legal status as Julie's father, and with it the obligation, imposed by Family Law Article § 5–203 [19] and the

---

**18.** In *Knill*, the court focused on the detriment to the child, Stephen, as opposed to any that was possibly suffered by the mother. In present case, counsel for the petitioner focuses the detriment analysis on Ms. Duckworth, noting that she did not suffer any. We will examine if there was a detriment to the child, Julie.

**19.** Maryland Code (1984, 2006 Repl.Vol.) § 5–203 of the Family Law Article, as relevant, provides:

"*Natural guardianship; powers and duties of parents; support obligations of grandparents; award of custody to parent.*
"(a) *Natural guardianship.*—

common law, to support Julie.[20] The Court of Special Appeals was satisfied as well that laches [21] had been raised timely and

---

(1) The parents are the joint natural guardians of their minor child.

\* \* \*

"(b) *Powers and duties of parents.*—The "parents of a minor child," as defined in Article 1, § 24 of the Code:

"(1) are jointly and severally responsible for the child's support, care, nurture, welfare, and education; and

"(2) have the same powers and duties in relation to the child."

**20.** This case is, as the Court of Special Appeals pointed out, factually dissimilar from *Walter v. Gunter*, 367 Md. 386, 788 A.2d 609 (2002). Aside from the obvious difference that *Walter v. Gunter* involved a "putative father," rather than a "presumptive" one, in that case, there was a *vacatur* of the paternity declaration, which eliminated "*the very paternity declaration, from which the child support order originates* [.]" *Id.* at 393, 788 A.2d at 613. (emphasis in original).

**21.** This Court addressed the laches defense recently in *Liddy v. Lamone*, 398 Md. 233, 242–43, 919 A.2d 1276, 1282–83 (2007), explaining:

"Laches is one of the affirmative defenses recognized and expressly listed in Md. Rule 2–323. Generally, it must be pled, but it can be invoked by a court on its own initiative. *See, e.g., Ipes v. Board of Fire Comm'rs of Baltimore*, 224 Md. 180, 183, 167 A.2d 337, 339 (1961) (recognizing that laches is a proper ground for refusing to issue a writ of mandamus); *Baltimore County v. Glendale Corp.*, 219 Md. 465, 468, 150 A.2d 433, 435 (1959)(noting that, although it is essential to raise the defense of laches in the pleadings, 'equity may decline relief for a stale claim after the facts are fully developed'); *Warburton v. Davis*, 123 Md. 225, 231, 91 A. 163, 165 (1914)(recognizing that a court, in a proper case and on its own motion, may refuse to grant relief to a complainant who on the final hearing appears to have been guilty of laches, although the defense was not interposed by the defendant), *citing Syester v. Brewer*, 27 Md. 288, 319 (1867). This Court has held that laches defense in equity 'is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society.' *Ross, supra*, 387 Md. at 668, 876 A.2d at 703, quoting *Parker v. Board of Election Supervisors*, 230 Md. 126, 130, 186 A.2d 195, 197 (1962); *Buxton v. Buxton*, 363 Md. 634, 645, 770 A.2d 152, 158 (2001); *Berman v. Leckner*, 193 Md. 177, 187, 66 A.2d 392, 396 (1949); *Kaufman v. Plitt*, 191 Md. 24, 28, 59 A.2d 634, 635 (1948). In its application, '[t]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case.' *Ross*, 387 Md. at 669, 876 A.2d at 704, quoting *Parker*, 230 Md. at 130, 186 A.2d at 197, *citing Brashears v. Collison*, 207 Md. 339, 352, 115 A.2d 289, 295 (1955); *Bowie v. Ford*, 269 Md. 111, 122, 304 A.2d 803, 810 (1973); *Day v. Day*, 237 Md. 229, 236, 205 A.2d 798, 803 (1965)."

applied to bar the petitioner's late challenge of his paternity. In addition, the intermediate appellate court relied on judicial estoppel.[22]

Applying the test of judicial estoppel, we conclude that the application of the doctrine in this case is persuasive. As to the first prong, the petitioner acknowledged his paternity of Julie in the Circuit Court on two separate occasions: (1) in the Separation Agreement which he executed with Ms. Duckworth in December of 1998 and presented to the court for incorporation, he represented that Julie was born of the marriage and, thus, that he was her father and (2) in 2002 in his answer to Ms. Duckworth's petition to establish fixed visitation and child support, he counter-petitioned for custody and, subsequently, in a Memorandum of Understanding, again represented that Julie was born of the marriage. In the 2005 proceedings, at which the support order emanating from the Memorandum of Understanding was at issue, however, the petitioner changed his factual position and alleged in his answer to the respondent's motion to modify that child sup-

---

22. The Court of Special Appeals did not address equitable estoppel. We believe that, unlike *Knill*, in the instant case, a strong case exists that the three elements required to raise an equitable estoppel are present. As mentioned earlier, the petitioner represented that he was Julie's biological father in several filings, including the Separation Agreement and the Memorandum of Understanding between the two parties, that were accepted by the Circuit Court, as evidenced by its incorporation of those agreements into the Judgment of Divorce and the court order of March, 2003. Julie, as did Stephen in *Knill*, carried the same last name as the petitioner's other children. That signaled to the world that Julie was the petitioner's biological child. It is reasonable to believe that, during the approximately thirteen years before the petitioner requested a paternity test, Julie believed that the petitioner was her father, the incident in 2001 involving Mr. Stanton's daughter notwithstanding. Throughout Julie's life, before the paternity test request, she relied on the petitioner for financial support. Moreover, the petitioner was court ordered, albeit for the most part with his consent and agreement, to pay child support for Julie. There is no assurance that, once the petitioner is relieved of that obligation, it will be met from another source, from the biological father, who, as far as the record reflects, has neither volunteered nor been requested to undertake it. There also is the matter of the child's emotional response to a ruling that would change her legal status and relationship. That too may be a detriment.

port order, that "the minor child, Julie Kamp, is not his biological daughter." Regarding the second prong, the position previously taken by the petitioner, inconsistent with his present one, had been accepted by the Circuit Court; responding to those filings, it had incorporated the Separation Agreement into the Judgment of Divorce and the Memorandum of Understanding into a court order.

As to the third prong of the judicial estoppel test, the petitioner knew, or should have known, both at the time of the divorce and custody proceedings and when Ms. Duckworth filed her petition to establish fixed visitation in 2002, that it was highly unlikely that he was Julie's father; he knew that he had had a vasectomy in 1987 and that Ms. Duckworth was involved in an affair during the time that Julie was conceived in 1992. Despite this knowledge, the petitioner, as we have seen, represented to the court that Julie was born of the marriage, she was his biological child. As a result of these representations the petitioner was awarded, successively and respectively, joint legal and shared physical custody. By claiming Julie as a dependant on his income taxes, moreover, the petitioner was also enabled to receive a tax deduction in 2003.

Nevertheless, we do not decide these issues. Indeed, we suggest that, where there is a belated request for DNA testing to challenge paternity, the success of which requires rebuttal of the presumption of paternity, a decision on these issues in advance of the decision whether to order testing is inappropriate. We have held, consistent with our prior cases, see *Turner* and *Evans*, both *supra*, that DNA testing to rebut the presumption of paternity requires a threshold showing of good cause that it is in the affected child's best interests to conduct such tests. The facts and considerations informing that preliminary determination are many of the same facts and considerations that inform the judicial estoppel and laches defenses. For example, how long the presumptive father maintained the father-daughter relationship and the manner in which he accepted and acknowledged it militates against rebuttal of the presumption and in favor of estoppel and laches.

If the showing of good cause fails, then paternity remains extant, with its concomitant responsibilities; there would be no occasion to address the defenses. Similarly, if good cause is found and the test result favors the challenging presumptive father, it would seem to follow that the presumption will have been rebutted and paternity vacated. Because they will have been considered in the preliminary proceedings, it is difficult to conceive of how they then could be used to, in effect, overrule that result.

JUDGMENT AFFIRMED, WITH COSTS.

HARRELL, MURPHY, and WILNER, JJ., Concur.

Concurring Opinion by HARRELL, J., which MURPHY and WILNER, JJ., join.

I concur in the affirmance of the judgment of the Court of Special Appeals; however, I write separately only to note that I would reach that conclusion solely upon the judicial estoppel analysis in the Majority opinion (Maj. op. at 672–78, 980 A.2d 464–68). The Majority opinion does not persuade me that the rest of its analysis is at all necessary. Thus, I would direct the Court of Special Appeals, in its remand of the case to the Circuit Court for Garrett County for further proceedings, specifically to deny Kamp's request to terminate his child support obligation and to reconsider Respondent's motion to modify child support.

Judge MURPHY and Judge WILNER authorize me to state that they join this concurrence.